UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

NYSE EURONEXT,
a foreign corporation,

Plaintiff,

vs.

Case No.: 07-80438

CIV-HURLEY

HOPKINS

NICOLAS ATWOOD, a Florida citizen; BITE BACK, INC., a Florida corporation; ANIMAL LIBERATION FRONT, an unincorporated association, JANE DOES 1-100 names being unknown and fictitious; and JOHN DOES 1-100 names being unknown and fictitious,

Defendants.

______________________________/

FILED BY ______ D.C.
2007 MAY 18 PM 12:56

**PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND INCORPORATED MEMORANDUM OF LAW**

Plaintiff, NYSE Euronext, by and through its undersigned counsel and pursuant to Fed. R. Civ. P. 65, files its Motion for Temporary Restraining Order against Defendants Nicolas Atwood, Bite Back, Inc. ("Bite Back"), Animal Liberation Front ("ALF"), Jane Does 1 – 100, and John Does 1 – 100 (collectively "Defendants"), their affiliates, members, supporters, agents, and representatives, and all those acting in concert with them, from continuing their unlawful campaign of harassment, intimidation, violence, and abuse against NYSE Euronext, its employees, and other individuals and entities associated with NYSE Euronext through Defendants' website and otherwise. In support of its Motion, NYSE Euronext has filed the Declaration of Brian F. Gimlett, Senior Vice President, Security for NYSE Group, Inc., a wholly-owned subsidiary of NYSE Euronext.

Dockets.Justia.com

# I. BACKGROUND

## A. The Parties and the History of Violence and Threats by Defendants

NYSE Euronext was formed through the combination of NYSE Group, Inc. ("NYSE Group") and Euronext N.V. ("Euronext") on or about April 4, 2007. NYSE Group operates and regulates two securities exchanges: the New York Stock Exchange, which is the world's largest and most liquid cash equities exchange, and NYSE Arca, Inc. ("NYSE Arca"), the first open, all-electronic stock exchange in the United States. Euronext, the first genuinely cross-border exchange organization, operates and provides services for regulated cash and derivatives markets in Belgium, France, the United Kingdom (derivatives only), the Netherlands and Portugal. *See Declaration of Brian Gimlett* ("*Gimlett Decl.*") ¶ 3.

The named and unnamed Defendants in this action are an association of individuals and a Florida for-profit corporation. Although they call themselves "animal rights" advocates, they are extremists (and federal law enforcement authorities consider them domestic terrorists) who utilize, promote, and glorify, among other activities, violent and otherwise unlawful means of furthering their stated goals. *See Gimlett Decl.* ¶¶ 6-7. Defendants Atwood and Bite Back own, maintain and control the www.directaction.info website and are responsible for its content (the "Website"). *See Gimlett Decl.* ¶¶ 8-12. A primary objective of the named and unnamed Defendants is to force the closure of Life Sciences Research, Inc. ("LSR") and its wholly-owned subsidiary, Huntingdon Life Sciences, Inc. ("HLS"). *Id.* The stock of LSR is listed on NYSE Arca. *Id.* The business of HLS includes product development and research for the biotechnology, agrochemical and pharmaceutical industries. *Id.* The research

provides necessary information about the safety and use of new pharmaceutical and chemical products, a portion of which involves the closely regulated use of animals. *Id.*

Since approximately November 1999, HLS and LSR have been the target of several animal rights extremist groups and individuals, including ALF, Animal Defense League, Stop Huntingdon Animal Cruelty ("SHAC"), Win Animal Rights ("WAR"), and Defendant Bite Back. *See Gimlett Decl.* ¶¶ 12-15. Apparently not satisfied with the progress of the attacks directed at HLS and LSR, Defendants have expanded the terror campaign to include entities and natural persons conducting business with or otherwise affiliated with LSR or HLS.

As a result of the animal rights extremists' activities, several companies and persons have been forced to seek relief from courts and have obtained numerous injunctions in the United States and abroad aimed at addressing the increasingly dangerous and violent activities of the various extremist groups and individuals. *See Gimlett Decl.* ¶ 16. Injunctions have been entered and are in effect in the following matters: *Huntingdon Life Sciences, Inc. and Mark L. Bibi v. Stop Huntingdon Animal Cruelty, et al.* (Sup. Ct. Westchester Cty., Index No. 19809/03); *Forest Laboratories, Inc. and Charles S. Ryan, et al. v. Animal Liberation Front, et al.* (Nassau Cty., Index No. 006527/05); *Smithkline Beecham Corp. d/b/a Glaxosmithkline, et al., v. Stop Huntingdon Animal Cruelty USA, Inc., et al.* (Philadelphia Cty., November Term 2006, No. 0366); *Huntingdon Life Sciences, Inc. and Life Sciences Research, Inc., v. Win Animal Rights ("WAR"), et al.* (Sup. Ct. N.Y. Cty., Index No. 602313/06); *Rotenberg Meril Solomon Bertiger & Guttilla, P.C., v. Stop Huntingdon Animal Cruelty, et al.* (Sup. Ct. of N.J., Bergen Cty. No. C-264-06); and *Huntingdon Life Sciences, Inc. and Life Sciences*

*Research, Inc., v. Nicholas Cooney a/k/a Nick Cooney Hugs for Puppies, et al.* (Sup. Ct. of N.J., Bergen Cty. No. C-435-06). *Id.*

Criminal law enforcement is making efforts to address the activities of extremists like Defendants. On March 2, 2006, a federal jury in New Jersey convicted SHAC and six individuals for their roles in a campaign to terrorize officers, employees and shareholders of HLS. *See Gimlett Decl.* ¶ 17. The charges included a count arising under the Animal Enterprise Protection Act and counts for interstate stalking and conspiracy to use a telecommunications device to abuse, threaten and harass persons. *Id.* Further, in order to provide law enforcement with greater tools to combat the growing extremist and illegal activities of animal rights protestors, the Animal Enterprise Protection Act was amended and renamed as the Animal Rights Terrorism Act, 18 U.S.C. § 43 ("ARTA") on November 27, 2006. ARTA increased the number of criminally proscribed actions and the severity of allowable penalties for any violation. In addition, on or about May 1, 2007, law enforcement officials from three European countries conducted pre-dawn raids in an effort to crack down on the animal rights extremists' illegal activities abroad, arresting thirty individuals connected with the animal rights extremist movement in Europe. *See Gimlett Decl.* ¶ 18.

**B. Defendants Target NYSE Euronext**

NYSE Euronext became a focus of Defendants' terror campaigns as a result of NYSE Euronext's business relationship with LSR. In December 2006, LSR's stock commenced trading on NYSE Arca, an all-electronic exchange operated by a subsidiary of NYSE Euronext. *See Gimlett Decl.* ¶ 19. As a result of that listing, the named and unnamed Defendants have targeted persons affiliated with NYSE Euronext in the

Netherlands, the United Kingdom, and elsewhere as part of their terror campaign against LSR and HLS. *See Gimlett Decl.* ¶ 20. On www.shac.net, a website with identical goals as Defendants' Website, NYSE Euronext was named as a "Category One" "target" and it was proclaimed that "They [NYSE Euronext] are THE prime target." *See Gimlett Decl.* ¶ 21(a).

After the designation of NYSE Euronext as a "prime target," the named and unnamed Defendants have increasingly directed their terror campaign at NYSE Euronext. On January 13, 2007 and January 17, 2007, demonstrations occurred at NYSE Euronext's Cannon Bridge Office in the United Kingdom. *See Gimlett Decl.* ¶ 21(b). These demonstrations occurred after www.shac.net published the business addresses of NYSE Euronext in Europe. *Id.* Subsequent to these demonstrations, LIFFE Administration and Management, the company which operates NYSE Euronext's derivatives market in the United Kingdom, obtained a High Court injunction in London, England. *Id.* The restrictions in the High Court injunction included, *inter alia*, a prohibition on posting personal information of directors and employees of NYSE Group, Euronext and affiliated entities on SHAC's website. *Id.*

Defendants have since stepped up their efforts to damage NYSE Euronext's business. On or about the night of March 7, 2007, unnamed Defendants attacked the property and homes of two Euronext employees; the employees' cars were attacked with acid and the tires ruined. One employee's home was vandalized with graffiti, including the word "Murderer." *See Gimlett Decl.* ¶ 21(c). Following the attacks on the Euronext employees, the Website trumpeted the criminal acts in the Netherlands against the

Euronext employees and attributed the attacks to Defendant ALF. *See Gimlett Decl.* ¶¶ 22-24.

In addition to boasting of the criminal attacks, the Website also included the names, home addresses, telephone numbers, and e-mail addresses of the two employees as well as two additional persons affiliated with NYSE Euronext. *Id.* Further, the Website posted the names and addresses of two members of the supervisory board of Van Der Moolen, a Netherlands-based financial services firm whose principal U.S. subsidiary is a NYSE member organization that serves as the specialist for over 400 NYSE-listed securities. Again, the Website posting urged unnamed Defendants to contact the additional named persons "day and night" and to paint their homes with the word "Pedophile." *Id.* To further illustrate the ongoing threat, the website of the Animal Defense League recently urged that action be taken against NYSE Euronext in April 2007. One posting on that website stated that "there was one thing NYSE Arca forgot when supporting [HLS]: who controls Wall Street." *See Gimlett Decl.* ¶ 21(d). A second posting planned several days of action against NYSE Euronext. *Id.* Both postings included a picture of a hooded figure. *Id.*

Since the attacks in the Netherlands, Plaintiff has been required to provide added security for targeted employees. *See Gimlett Decl.* ¶ 26. In addition, Dutch police have intensified patrols in one employee's neighborhood in response to the criminal conduct advocated and encouraged by Defendants. *Id.*

## II. MEMORANDUM OF LAW

The Court should grant the requested temporary restraining order. Defendants have no valid or legitimate justification for publishing or maintaining personal information relating to NYSE Euronext employees or agents on the Website, especially when the information is plainly aimed at encouraging criminal conduct. NYSE Euronext has established the required elements for injunctive relief, and notice to Defendants would unnecessarily risk retaliation and additional irreparable harm. Further, if notice of the requested relief is given, Defendants are likely to simply move the offensive information to another website or to disseminate the information through e-mail or other means before any order is entered, thereby rendering it difficult for NYSE Euronext to obtain meaningful relief.

### A. Notice to Defendants Should Not be Required

Pursuant to Fed. R. Civ. P. 65(b), notice to Defendants should not be required before entry of a temporary restraining order against Defendants because NYSE Euronext and its employees are facing irreparable harm and this irreparable harm is as or more likely to occur if notice is given to Defendants. As named and unnamed Defendants have targeted NYSE Euronext employees for their terror campaign, the personal safety of NYSE Euronext employees, their families and property have become an issue. Courts often find irreparable harm and enter temporary restraining orders when the safety and health of individuals are at stake.[1] *See Heather K. by Anita K. v. City of Mallard, Iowa*, 887 F. Supp. 1249, 1260 (N.D. Iowa 1995) (entering a temporary restraining order to

[1] Moreover, a court should consider the harm to interested parties such as NYSE Euronext's employees not joined in the suit. *See Delaware River Port Auth. v. Transamerican Trailer Transport, Inc.*, 501 F.2d 917, 920 (3d Cir. 1974).

prevent fires that risked the life of the plaintiff); *United States v. Phillips*, 527 F. Supp. 1340, 1343 (N.D. Ill. 1981) (entering a temporary injunction to protect the safety of government employees); *LaForest v. Former Clean Air Holding Co., Inc.*, 376 F.3d 48, 55 (2d Cir. 2004) (finding irreparable harm based on substantial risk to plaintiffs' health and anxiety associated with uncertainty regarding their health); *Crowder v. Kelly*, 928 F. Supp. 2, 6 (D.D.C.1996) (finding irreparable harm based on health concerns related to exposure to cigarette smoke); *see generally Fimab-Finanziaria Maglificio Biellese Fratelli Fila S.P.A. v. Helio Import/Export*, 601 F.Supp. 1, 3 (S.D. Fla.1983).

Further, the relief should be granted without notice so that the personal information at issue cannot merely be moved to another website or location in order to make relief against them meaningless or difficult to enforce. A court should enter a temporary restraining order without notice to the opposing party, when notice will render fruitless the further prosecution of the case. *See In re Matter of Vuitton et Fils S.A.*, 606 F.2d 1, 5 (2d Cir. 1979). In *Vuitton*, the court entered a writ of mandamus, requiring the district court to enter a temporary restraining order without notice, because the defendants were likely to remove the counterfeit material and the evidence regarding the source of the counterfeits. *Id.* at 2-3. As a result of defendants' activities, Vuitton was unable to enjoy the full protection of an injunction. *Id.* Similarly, if notice is provided to Defendants Bite Back and Atwood before entry of a temporary restraining order, it is highly likely that they will shift the confidential and harmful information to a different website maintained by unnamed Defendants. However, if the Court requires the Defendants to remove the information without notice, the Court can stop the continued

dissemination of this information. Accordingly, the Court should enter a temporary restraining order without notice to the Defendants.

**B. <u>NYSE Euronext has Established All Necessary Elements for a Temporary Restraining Order</u>**

A party seeking temporary injunctive relief must demonstrate that: (1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered if the relief is not granted; (3) the threatened injury outweighs the harm the relief would inflict on the non-movant; and (4) the entry of the relief would serve the public interest. *Schiavo v. Schiavo*, 403 F.3d 1223, 1225-26 (11th Cir. 2005). As shown below, NYSE Euronext has clearly established all of these requirements.

**1. <u>NYSE Euronext has Established a Likelihood of Success on the Merits</u>**

Through the Declaration of Brian Gimlett, NYSE Euronext has clearly established that it is likely to succeed on the merits of its claims against Defendants. First, NYSE Euronext is likely to succeed on its claims for tortious interference with its contractual business relationships with its listed companies and employees. In order to succeed on its claim for tortious interference, NYSE Euronext must show: 1) the existence of a relationship or contract with its customers or employees; 2) Defendants' knowledge of the relationship; 3) Defendants' interference with that relationship; and 4) damage as a result of the interference. *KMS Restaurant Corp. v. Wendy's Intern., Inc.*, 361 F.3d 1321, 1325 (11th Cir. 2004). There is no question that NYSE Euronext has a business relationship with its employees and customers. *See Gimlett Decl.* ¶¶ 19-21. Further, Defendants obviously knew of the relationships and have taken the actions at issue precisely because these relationships exist and with the specific goal of targeting and

interfering with these relationships. *See Gimlett Decl.* ¶¶ 11-21. Defendants' terror campaign against NYSE Euronext employees and NYSE Euronext's business activities has interfered with these relationships and business activities and has harmed and will continue to harm NYSE Euronext. *Id.* Defendants can offer no lawful reason for maintaining the personal information of NYSE Euronext employees or agents on their Website and have done so for the sole and express reason of encouraging violence against and harassment of NYSE Euronext employees and agents. Accordingly, NYSE Euronext is likely to succeed on its claims for tortious interference.

Moreover, NYSE Euronext is likely to succeed on its claim for equitable relief. A claim for equitable relief is designed to be flexible to do justice between the litigants. *See Demorizi v. Demorizi*, 851 So.2d 243, 246 (Fla. 3d DCA 2003). In this case, Defendants are causing irreparable harm by purposely jeopardizing the safety of NYSE Euronext employees and interfering with NYSE Euronext's business and employment relationships. Moreover, NYSE Euronext has no adequate remedy at law for these actions. Accordingly, NYSE Euronext has established that it is likely to prevail on its equitable claim.

### 2. **NYSE Euronext Will Suffer Irreparable Harm if Relief is not Granted**

Certain unnamed Defendants have threatened NYSE Euronext's employees and vandalized their property, and such attacks have caused and will continue to cause irreparable harm to NYSE Euronext if not stopped. As noted above, courts often find irreparable harm when the safety and health of an individual is at stake. *See LaForest v. Former Clean Air Holding Co., Inc.*, 376 F.3d 48, 55 (2d Cir. 2004) (finding irreparable harm based on substantial risk to plaintiffs' health and anxiety associated with uncertainty

regarding their health); *Crowder v. Kelly*, 928 F. Supp. 2, 6 (D.D.C. 1996) (finding irreparable harm based on health concerns related to exposure to cigarette smoke); *Heather K. by Anita K. v. City of Mallard, Iowa*, 887 F. Supp. 1249, 1260 (N.D. Iowa 1995) (entering a temporary restraining order to prevent fires that risked the life of the plaintiff); *United States v. Phillips*, 527 F. Supp. 1340, 1343 (N.D. Ill. 1981) (entering a temporary injunction to protect the safety of government employees). No individual should have to endure the ongoing posting or maintaining of personal information on any website that promotes or encourages criminal and illegal conduct as the Website does. NYSE Euronext will also suffer irreparable injury to its business without the Court's intervention. *See Ferrero v. Associated Materials Inc.*, 923 F.2d 1441, 1449 (11th Cir. 1991) (finding irreparable harm in loss of goodwill and customers). Accordingly, this requirement for entry of a temporary restraining order has been satisfied.

### 3. **The Balance of Harms Clearly Favors NYSE Euronext**

To obtain a temporary restraining order, the Court must assess the relative hardship to the parties in granting or denying relief. NYSE Euronext is entitled to conduct its business peacefully and in an atmosphere free of criminal conduct, harassment, violence, vandalism, and threats. NYSE Euronext's employees are also entitled to be free of criminal conduct, harassment, violence, vandalism and threats. In contrast, Defendants will not be harmed at all by a temporary restraining order, because they have no right to engage in the actions against which NYSE Euronext seeks injunctive relief. Further, even if Defendants could allege any harm, such harm would be grossly outweighed by the hardship created by Defendants' interference in the business

activities and business relationships of NYSE Euronext and the safety and well being of NYSE Euronext employees.

#### 4. <u>**The Public Interest Will Not be Harmed by the Requested Relief**</u>

The relief sought will not harm the public interest. The public has an interest in the safety and well being of individuals as well as the ability of an individual entity to conduct business without unlawful interference. *See generally Sac & Fox Nation of Missouri v. LaFaver*, 905 F. Supp. 904, 907 (D. Kan.1995) (finding public interest in safety of citizens); *Snap-N-Pops, Inc. v. Browning*, 432 F. Supp. 360, 364 (E.D.Va. 1977) (same).[2] This interest is arguably even more acute when the movant is the leading provider of national and international financial markets. A temporary restraining order in this case will help terminate unlawful, harassing and violent conduct that is designed solely to threaten the business of NYSE Euronext and the safety of its employees. If Defendants' conduct is left unrestrained, the terror tactics, violence, and unlawful activity will almost certainly continue. Accordingly, the requested relief will not harm, and will in fact promote the public interest.

### C. <u>**No Bond or a Minimal Bond Should Be Required**</u>

Although the language of Fed. R. Civ. P. 65(c) indicates that a bond is required, a district court has discretion to dispense with the bond requirement. *See Corrigan Dispatch Co. v. Casa Guzman, S. A.*, 569 F.2d 300, 302-03 (5th Cir. 1978); *CBS Inc. v. Smith*, 681 F.Supp. 794, 806 (S.D. Fla.1988); *see also LaForest v. Former Clean Air Holding Co., Inc.*, 376 F.3d 48, 60-61 (2d Cir. 2004); *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003); *Doctor's Associates, Inc. v. Stuart*, 85 F.3d 975, 984 (2d Cir.

---

[2] The public also has an interest in discouraging criminal behavior, and particularly violent criminal behavior, even when its perpetrators try to justify it as "activism."

1996); *Moltan Co. v. Eagle-Picher Industries, Inc.*, 55 F.3d 1171, 1176 (6th Cir. 1995). In this case, no bond should be required. Defendants simply have no possible monetary damages if they are required to remove the offending information.

Nevertheless, if a bond is deemed appropriate, a nominal amount is more than sufficient to cover Defendants' potential loss. The amount of the bond is within the discretion of the court, and a court is to consider a defendant's potential loss, plaintiff's potential enrichment, and the likelihood that harm will occur. *See Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 421 (4th Cir. 1999). In the instant case, Defendants' potential loss is minimal at most, and NYSE Euronext seeks no enrichment, but merely the prevention of further harm. Moreover, it is unlikely that harm will occur as a result of granting a temporary restraining order designed to prevent unjustified threats to innocent employees. Accordingly, if a bond is deemed necessary, the bond amount should be minimal, and NYSE Euronext proposes an amount not in excess of $100.00.

**D. <u>Conclusion</u>**

As shown above, NYSE Euronext has established all of the elements for a temporary restraining order without notice to Defendants, providing the relief requested below.

## III. <u>RELIEF REQUESTED</u>

NYSE Euronext has met all requirements for a temporary restraining order under Rule 65, Federal Rules of Civil Procedure. Thus, NYSE Euronext seeks a Temporary Restraining Order enjoining Defendants from:

(1) placing or maintaining upon any website, including specifically www.directaction.info, or disseminating by written correspondence or electronically by the internet, e-mail or otherwise (including by transmission using the telephone or facsimile), any personal or confidential information, including names, addresses, likenesses, telephone numbers, mobile numbers, license plate numbers, e-mail addresses, bank account numbers, credit card numbers, drivers' license numbers, social security numbers, or any other information that identifies or relates to the person or family members or real or personal property of these persons, regarding any current or former employee, officer, director, consultant, independent contractor, or representative of NYSE Euronext, including its current or future parents, subsidiaries and affiliates, or any entity known or believed to have business or economic relations with NYSE Euronext, or known or believed to have a prospective business or economic relationship with NYSE Euronext, or regarding any person known or believed to be a family member of any such person; and

(2) sending any unsolicited e-mail of a threatening or harassing nature, making any unsolicited telephone calls of a threatening or harassing nature, or directing, causing, inducing or encouraging others to send any such unsolicited e-mail, to any account owned by or maintained for the benefit of any entity, or any employee, director or representative of any entity, known or believed to have business or economic relations with NYSE Euronext, or known or believed to have a prospective business or economic relationship with NYSE Euronext.

Additionally, NYSE Euronext seeks a Temporary Restraining Order requiring Defendants to:

(1) post on all websites owned, operated or controlled by any of the Defendants, which relate to animal rights or a campaign against NYSE Euronext, the following language: "Notice: The United States District Court for the Southern District of Florida has issued an order prohibiting certain activity relating to the NYSE Euronext, including its current or future parents, subsidiaries, and affiliates and any persons or entities having business or economic relations with NYSE Euronext";

(2) post the foregoing statement as a continuously visible underlined hyperlink which, when clicked, displays only a legible, complete and unmodified copy of all pages of the Order. Such notice shall be posted on the home page of any website owned or operated by Defendants, in a typeface and color that is consistent with the most prominent reference to NYSE Euronext on each such page, and in a manner whereby the hyperlink is proximately located to the most prominent reference to NYSE Euronext on the page and that the hyperlink would ordinarily be displayed to users viewing the page, and from promoting or encouraging any act of violence, intimidation, threat, harassment, or abuse against any of NYSE Euronext's employees; and

(3) take such other action as the Court deems appropriate.

## IV. CONCLUSION

For all of the foregoing reasons, NYSE Euronext requests that this Court enter a temporary restraining order against Defendants as outlined above.

Respectfully submitted on May 16, 2007.

MILAM HOWARD NICANDRI
DEES & GILLAM, P.A.

By: ______________________
Paul M. Renner
Florida Bar No. 40304
14 East Bay Street
Jacksonville, Florida 32202
Tel: (904) 357-3660
Fax: (904) 357-3661

ATTORNEYS FOR PLAINTIFF