UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

NYSE EURONEXT,
a foreign corporation,

Plaintiff,

vs.

Case No.: 07-80438
CIV - HURLEY

NICOLAS ATWOOD, a Florida citizen; BITE BACK, INC., a Florida corporation; ANIMAL LIBERATION FRONT, an unincorporated association; JANE DOES 1-100 names being unknown and fictious; and JOHN DOES 1-100 names being unknown and fictitious,

Defendants.
_______________________________________/

FILED BY ______ D.C.
2007 MAY 18 PM 12:56
CLERK U.S. DIST. CT.
S.D. OF FLA. - W.P.B.

**DECLARATION OF BRIAN F. GIMLETT IN SUPPORT OF NYSE EURONEXT'S MOTION FOR TEMPORARY RESTRAINING ORDER**

BRIAN F. GIMLETT declares, pursuant to 28 U.S.C. § 1746:

1. I am Senior Vice President, Security, for NYSE Group, Inc. ("NYSE Group"), a wholly-owned subsidiary of NYSE Euronext, a Delaware corporation. I make this declaration in support of NYSE Euronext's request for a temporary restraining order and preliminary injunction. This declaration is based on my own personal knowledge, my over thirty years of experience in the law enforcement and private security communities, my review of NYSE Euronext documents, and my discussions with other NYSE Euronext personnel.

Dockets.Justia.com

2. I commenced my employment with NYSE Group in 2006. Prior to my employment with NYSE Group, I held a variety of positions in law enforcement and security in the public and private sectors, including as Special Agent in Charge of the United States Secret Service's New York Field Office and Executive Director of Global Security, Wyeth Pharmaceuticals.

3. NYSE Euronext was formed through the combination, on or about April 4, 2007, of NYSE Group and Euronext N.V. ("Euronext"). NYSE Group operates and regulates two securities exchanges: the New York Stock Exchange, which is the world's largest and most liquid cash equities exchange, and NYSE Arca, Inc. ("NYSE Arca"), the first open, all-electronic stock exchange in the United States. Euronext, the first genuinely cross-border exchange organization, operates and provides services for regulated cash and derivatives markets in Belgium, France, the United Kingdom (derivatives only), the Netherlands and Portugal.

4. The safety and security of NYSE Euronext employees, officers, directors and agents ("NYSE Euronext Personnel") is a paramount concern of NYSE Euronext and is a primary job responsibility of both myself and my counterparts employed by NYSE Euronext in Europe.

5. The instant Complaint and request for injunctive relief is being filed in furtherance of the foregoing responsibilities of NYSE Euronext, and to specifically protect NYSE Euronext Personnel from the ongoing publication by the named and unnamed Defendants of their names, home addresses, telephone numbers, e-mail addresses and other private or personal information of NYSE Euronext Personnel, since this publication has been, and will continue to be, utilized to enable and encourage animal rights extremists to target NYSE Euronext Personnel and their families and property.

6. The named and unnamed Defendants in this action are an association of individuals and a Florida for-profit corporation. Although they style themselves, albeit loosely, as "animal rights" advocates, they utilize, promote and glorify, among other activities, violent and otherwise unlawful means of furthering their stated advocacy.

7. I fully endorse, and incorporate by reference herein, the following excerpt from a May 1, 2007 statement by a United Kingdom law enforcement official describing -- in connection with the arrest of 30 individuals in the United Kingdom on April 30, 2007 -- the means, methods and objectives of extremist "animal rights" advocates:

> In recent years, animal rights extremists have conducted sustained campaigns of harassment and intimidation against the animal research industry, seeking to achieve their objectives by creating a climate of fear.
>
> Although the vast majority of animal rights protesters campaign lawfully, a small minority seeks to force change through criminal action.
>
> To some animal rights extremists, any organizations and individuals who have links to the animal research industry are justifiable targets, however tenuous those links might be.
>
> The victims of animal rights extremism are not only companies or universities. It is employees along with their families, friends and neighbors who often are often targeted in their own homes. The impact of these personalized campaigns on individuals is deeply distressing and often involves criminal activity.

The Federal Bureau of Investigation issued a similar statement on May 1, 2007 after the arrests, which echoed the views expressed in the statement from the United Kingdom regarding these extremist activities. True and correct copies of the statements are attached as Exhibit "1" to this Declaration.

8. I have investigated, visited and reviewed the website www.directaction.info. The domain name "directaction.info" is a registered domain name with an ongoing business operation in the State of Florida. The domain name "directaction.info" was registered by Defendant Atwood and Defendant Bite Back, Inc. ("Bite Back") on September 13, 2001. The sponsoring internet service provider ("ISP") is Network Solutions.

9. The "directaction.info" domain name is registered to Defendant Bite Back, a Florida for-profit corporation located at 222 Lakeview Avenue, Suite 160-231, West Palm Beach, Florida, 33401.

10. Based upon my own knowledge and lengthy experience as a law enforcement professional, the term "direct action" refers to a violent form of activism that seeks an immediate remedy for perceived societal harms, as opposed to "indirect actions" that require working within the political process. Defendants, and others, actively encourage, publicize and glamorize "direct actions" because such acts tend to be directed against a human being and/or the real or personal property of such person, and involve activities such as sabotage, intimidation, demonstrations, vandalism, graffiti, assaults, threats, and protests. Accordingly, the domain name "directaction.info" is itself suggestive of the types of activities that Defendants Atwood and Bite Back, Inc. condone and encourage within the community.

11. The www.directaction.info website contains a page stating in part that "the brave women and men of the Animal Liberation Front are out liberating, smashing, painting, and burning their way across the world for no other reason than to bring us closer to animal liberation! The least we can do is support their actions. Do so by distributing Bite Back Magazine in your area!" A true and correct copy of pages appearing on www.directaction.info and including this statement are attached to this Declaration as Exhibit "2".

12. It is apparent from my review of the www.directaction.info website that Defendants Atwood and Bite Back maintain that a primary object of the named and unnamed Defendants, including the Animal Liberation Front ("ALF"), Bite Back and "directaction.info", is to force the closure of Life Sciences Research, Inc. ("LSR") and its wholly-owned subsidiary, Huntingdon Life Sciences, Inc. ("HLS"), by targeting anyone who conducts business with LSR or HLS for extremist and illegal action.

13. LSR is a Maryland corporation whose stock is listed on NYSE Arca. HLS is a wholly-owned subsidiary of LSR. The business of HLS includes product development and research for the biotechnology, agrochemical, and pharmaceutical industries. The research provides necessary information about the safety and use of new pharmaceutical and chemical products, a portion of which involves the closely regulated use of animals.

14. Since approximately November 1999, HLS and LSR have been the focus of several animal rights extremist groups and individuals, including ALF, Animal Defense League, Stop Huntingdon Animal Cruelty ("SHAC"), Win Animal Rights ("WAR"), and Defendant Bite Back.

15. As part of their campaign of terrorism, Defendants routinely disseminate personal and private information about "targets", *i.e.*, employees of HLS, LSR, or employees of unrelated third parties who conduct business with HLS or LSR, on websites. This information has included individuals' home addresses, telephone numbers, email addresses, credit card numbers, and even the schools their children attend. The broadcast of this information is designed to and does encourage, incite, and direct others, including the unnamed Defendants, to focus their extremist and illegal activities on these individuals. By placing such information on a website or

email, the Defendants are intentionally and knowingly directing, encouraging or inciting the extremist and illegal activities of other unnamed animal rights extremists.

16. As a result of these activities, LSR and HLS, as well as other persons that have been targeted as a result of doing business with LSR or HLS, have sought and obtained numerous injunctions in the United States (and abroad) aimed at addressing the increasingly dangerous, violent and illegal activities of various animal rights extremist groups and individuals. Among other matters, injunctions have been entered and are in effect in the following matters:

a. *Huntingdon Life Sciences, Inc. and Mark L. Bibi v. Stop Huntingdon Animal Cruelty, et al.* (Sup. Ct. Westchester Cty., Index No. 19809/02), wherein the Supreme Court in Westchester County, New York issued an injunction against ALF, SHAC, and other animal rights protestors on April 25, 2003. A true and correct copy of the injunction order is attached to this Declaration as Exhibit "3".

b. *Forest Laboratories, Inc. and Charles S. Ryan, et al. v. Animal Liberation Front, et al.* (Nassau Cty., Index No. 006527/05), wherein the Nassau County Supreme Court issued an injunction against ALF, SHAC, and other animal rights protestors on December 23, 2005. A true and correct copy of the injunction order is attached to this Declaration as Exhibit "4". This injunction, prohibited, *inter alia*, stalking, harassment, trespassing, threats, and other acts of intimidation against Forest Laboratories (which had been targeted due to its business relationships with LSR and HLS), including "placing or maintaining upon any website personal or confidential information regarding any employee or agent of Plaintiff Forest or any family member thereof on any website."

c. *Smithkline Beecham Corp. d/b/a Glaxosmithkline, et al., v. Stop Huntingdon Animal Cruelty USA, Inc., et al.* (Philadelphia Cty., November Term 2006, No. 0366), wherein the Court of Common Pleas in Philadelphia, Pennsylvania entered an injunction against SHAC, Hugs For Puppies, and other animal rights protestors on November 27, 2006. A true and correct copy of the injunction order is attached to this Declaration as Exhibit "5". This injunction prohibited, *inter alia*, stalking, violence, harassment, trespassing, threats, and other acts of intimidation against Glaxosmithkline by animal rights protestors.

d. *Huntingdon Life Sciences, Inc. and Life Sciences Research, Inc., v. Win Animal Rights, et al.* (Sup. Ct. N.Y. Cty., Index No. 602313/06), wherein the Supreme Court, New York County issued a preliminary injunction against Win Animal Rights and other animal rights protestors on April 9, 2007. A true and correct copy of the injunction order is attached to this Declaration as Exhibit "6". This injunction, prohibited, *inter alia,* stalking, harassment, trespassing, threats, and other acts of intimidation against HLS and LSR "or any entity known or believed to have business or economic relations with HLS or LSR.

e. *Rotenberg Meril Solomon Bertiger & Guttilla, P.C., v. Stop Huntingdon Animal Cruelty, et al.* (Sup. Ct. of N.J., Bergen Cty. No. C-264-06), wherein the Superior Court of New Jersey for Bergen County issued an injunction against Nick Cooney, Hugs for Puppies, Win Animal Rights, and other animal rights protestors on August 4, 2006. A true and correct copy of the injunction order is attached to this Declaration as Exhibit "7". This injunction prohibited, *inter alia*, violence, harassment, threats, and interference with email and telephone communications and other acts of intimidation against the plaintiffs and, *inter alia*, required the defendants to post on-going notice of the injunction on their website.

f. *Huntingdon Life Sciences, Inc. and Life Sciences Research, Inc., v. Nicholas Cooney a/k/a Nick Cooney; Hugs for Puppies, et. al.* (Sup. Ct. of N.J., Bergen Cty. No. C-435-06), wherein the Superior Court of New Jersey for Bergen County issued an injunction against Nick Cooney, Hugs for Puppies, and other animal rights protestors on December 22, 2006. A true and correct copy of the injunction order is attached to this Declaration as Exhibit "8". This injunction prohibited, *inter alia*, stalking, violence, harassment, trespassing, threats, and other acts of intimidation against HLS and LSR "or any entity known or believed to have business or economic relations with HLS or LSR."

17. On March 2, 2006, a federal jury in New Jersey convicted SHAC and six individuals for their roles in a campaign to terrorize officers, employees and shareholders of HLS. The charges included a count arising under the Animal Enterprise Protection Act and counts for interstate stalking and conspiracy to use a telecommunications device to abuse, threaten and harass persons. I am familiar with the court proceedings in this matter and am aware that the defendants in this matter routinely posted personal information of HLS employees on their websites, including names, addresses, and telephone numbers. These websites at issue encouraged and incited SHAC members and followers to direct their intimidation, harassment and violence at HLS and its employees. To provide law enforcement with greater tools to combat animal rights' illegal activities, the Animal Enterprise Protection Act was amended and renamed as the Animal Rights Terrorism Act, 18 U.S.C. § 43 on November 27, 2006.

18. Recently, on or about May 1, 2007, following a two-year investigation into animal rights extremism, law enforcement officials from the United Kingdom, the Netherlands, and Belgium (all countries where NYSE Euronext has offices) conducted pre-dawn raids in an effort to combat the illegal activities of animal rights extremists' in those countries, arresting thirty individuals connected with the animal rights extremist movement in Europe.

**THE LISTING OF LSR STOCK LEADS TO THREATS AND ATTACKS AGAINST NYSE EURONEXT EMPLOYEES**

19. On December 22, 2006, LSR listed its stock on NYSE Arca, an all-electronic exchange operated and regulated by a subsidiary of NYSE Euronext.

20. As a result of the listing of the stock of LSR, and by virtue of Euronext's proposed and now consummated combination with NYSE Group, the named and unnamed Defendants are increasingly targeting NYSE Euronext Personnel in the Netherlands, the United Kingdom and elsewhere as part of their terror campaign against LSR and HLS. Upon information and belief, Euronext employees had not been targeted generally or subjected to specific acts of vandalism until after the proposed combination between Euronext and NYSE Group was announced in 2006.

21. I believe that the following actions and incidents involving NYSE Euronext Personnel are a direct response of the named and unnamed Defendants to the listing of LSR stock on NYSE Arca:

a. In January 2007, the website www.shac.net contained a posting under the heading "Our tactics" which states: "Our tactics are simple and the same as they ever were BUT the targets ... fall into two distinct categories. Category One is the NYSE and Euronext. These people have their hands drenched in the blood of the animals inside HLS. They are THE prime

target." The posting then sets out what are described as the "Category Two" targets. The exhibited material shows the publication of the individual names and residential addresses of the directors of NYSE Euronext.

b. On January 13, 2007 and January 17, 2007, demonstrations occurred at NYSE Euronext's Cannon Bridge Office in the United Kingdom. These demonstrations occurred after the website www.shac.net published the business addresses of NYSE Euronext in Europe. Subsequent to these demonstrations, LIFFE Administration and Management, the company which operates NYSE Euronext's derivatives market in the United Kingdom, obtained (on behalf of itself, NYSE Group, Euronext, and affiliated entities) a High Court injunction in London, England which included a ban on web posting of personal information of employees. A true and correct copy of this injunction is attached as Exhibit 9 to this Declaration.

c. On or about the night of March 7, 2007, two Euronext employees reported to Dutch police in Amsterdam, the Netherlands, that their cars were attacked with acid and the tires ruined. One employee's name was sprayed with graffiti, including the word "Murderer." One employee is a Dutch citizen and the Group Head of Market Supervision & Compliance/Director of Legal Relations at NYSE Euronext's operations in the Netherlands. The second employee serves as Managing Director of Information Services for Euronext' operations in the Netherlands.

d. The website for the Animal Defense League located at www.animaldefense.info recently urged unnamed Defendants to target NYSE Euronext in April 2007. Upon information and belief, one posting stated that "there was one thing NYSE Arca forgot when supporting [HLS]: who controls Wall Street." The second posting referenced a

number of planned demonstration days. Both postings included a picture of a hooded figure. True and correct copies of these postings are attached as Exhibit "10" to this Declaration.

22. Following the events described in paragraph 21(c) above, Defendants' Website, www.directaction.info, posted or maintained an account of the criminal acts in the Netherlands against the NYSE Euronext employees and included the names and home addresses of the two employees. Further, the telephone number and e-mail address of one employee was posted exhorting readers to telephone this person "day and night" and to send spam to the e-mail address. The Website extolled the violent and destructive attack on the employees, noting with respect to one employee that "ALF paint stripped his cars and redecorated his fancy house" and urging "[z]ero tolerance towards those who profit" from conducting business with HLS. The Employee was referred to as a "scumbag." A true and correct copy of the posting is attached to this Declaration as Exhibit 11. The names and other personal information have been redacted in order to avoid further publication of the names and personal information. I understand that unredacted copies of the posting are available for submission to the Court in this matter if the Court requests.

23. The Website also posted or maintained the names and addresses of two additional persons affiliated with NYSE Euronext, including a member of the Board of Directors of a pension fund for NYSE Euronext and the former Head of Compliance Affairs for Euronext. Additionally, the Website posted the names and addresses of two members of the supervisory board of Van Der Moolen, a Netherlands-based financial services firm whose principal U.S. subsidiary is an NYSE member organization that serves as the specialist for over 400 NYSE-listed securities.

24. The posting on www.directaction.info attributes the attacks in the Netherlands to Defendant ALF, a common defendant in the various actions that LSR, HLS and others have instituted. The posting asks other animal rights extremists to call the four individuals affiliated with Euronext "day and night" and to paint their homes with the word "Pedophile."

25. On or about April 10, 2007, the leading Dutch newspaper, *De Telegraaf,* published a front-page article detailing the recent "terroristic attacks" on the part of animal rights protestors. This article was copied by most Dutch newswires as well as by *De Tijd*, a leading Belgian newspaper. The Dutch newspaper article detailed the actions that ALF and the unnamed Defendants had taken against the four NYSE Euronext employees and representatives. Due to Dutch privacy laws, the newspaper could not itself publish the names and addresses of the targeted NYSE Euronext employees but informed readers that their names and addresses could be viewed at Defendant Atwood's and Defendant Bite Back's Website located at "www.directaction.info."

26. Following publication of these articles, NYSE Euronext was obligated to install additional safety measures at one employee's home. Dutch police have intensified patrols in his neighborhood in response to the animal rights protestors' threats and criminal conduct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 10, 2007
in New York, New York.

Brian F. Gimlett

# EXHIBIT
# 1

■ SURREY ■ POLICE

KENT POLICE

HAMPSHIRE CONSTABULARY

## Press conference script

1100hrs, 1 May 2007

ACC Steve Watts, Hampshire Constabulary:

"Good morning everyone, my name is Assistant Chief Constable Steve Watts.

"Thank you for coming to the Hampshire Constabulary Southern Support and Training Headquarters at Netley this morning. The purpose of this briefing is to update you about a coordinated police operation that has taken place across the country today in relation to criminal activity associated with animal rights extremism.

"The police activity today forms part of a regional police operation that began in May 2005. The operation involves police officers and staff from Hampshire Constabulary, Kent Police, Surrey Police, Sussex Police and Thames Valley Police. There has also been a significant contribution from the City of London Economic Crime Unit. We have been assisted this



**Exhibit "1"**

morning by the Metropolitan Police Service and police forces from South Wales, Strathclyde, North Yorkshire, West Mercia and West Yorkshire. We are also grateful for support from law enforcement agencies in Belgium and the Netherlands. In total over 700 police officers and supporting staff have been involved this morning.

"I will now hand over to Assistant Chief Constable Adrian Leppard from Kent Police, who will give more details about animal rights extremism and the police activity today.

ACC Adrian Leppard, Kent Police:

"Good morning everyone.

"Before I give details of the operation this morning, I want to remind everyone about the nature of animal rights extremism and the effect it has on its victims.

"In recent years, animal rights extremists have conducted sustained campaigns of harassment and intimidation against the animal research industry, seeking to achieve their objectives by creating a climate of fear.

"Although the vast majority of animal rights protesters campaign lawfully, a small minority seeks to force change through criminal action.

"To some animal rights extremists, any organisations and individuals who have links to the animal research industry are justifiable targets, however tenuous those links might be.

"The victims of animal rights extremism are not only companies or universities. It is employees along with their families, friends and neighbours who often are often targeted in their own homes. The impact of these personalised campaigns on individuals is deeply distressing and often involves criminal activity.

"While animal right extremism affects the whole of the United Kingdom, there are a greater proportion of incidents in the south east. This led forces in the region to work together to investigate a range of criminal offences including conspiracy to blackmail and offences under the Serious Organised Crime and Police Act targeting animal research organisations.

"It is important to stress that this operation, which has been running for over two years, has been targeting the criminals who are involved with animal rights extremism. The operation

is not targeting lawful animal welfare campaigners who have every right to express their personal views on such issues.

"The police operation today began at five thirty this morning when over 700 police officers and support staff executed warrants to enter and search twenty nine addresses throughout the United Kingdom, and one in Belgium and two the Netherlands.

"As part of the operation, thirty people have been arrested. The arrests took place in Berkshire, Hampshire, Surrey, Sussex, Kent, Greater London, Merseyside, Worcestershire, Lancashire, Northumbria and Yorkshire. All the people detained are being held at undisclosed police stations across the country, and are being interviewed throughout the day.

"Police and forensic teams are in the process of undertaking searches of a number of residential addresses. We expect that these searches will last for several hours.

"There may be some minor disruption to communities where the searches are taking place. Police officers from the local forces are working to minimise any inconvenience to people in these areas.

"Our investigation is likely to continue for several days. I appreciate that people will want more information about the individuals arrested and the offences under investigation. However, as I'm sure you will appreciate I am unable to provide any further details at this time while people are in custody.

"When there are any further developments we will to keep you updated."

Ends

Notes to editors:

1. Hampshire Constabulary press office is managing media interest in the operation. The press office can be contacted on 01962 871027, 875017, or 804060.
2. All further updates will be placed on the Hampshire Constabulary media voicebank, which is accessible by calling 08715 508025.

# Press Release

**For Immediate Release**
**May 1, 2007**

**Washington D.C.**
**FBI National Press Office**
**(202) 324-3691**

## Statement of FBI Counterterrorism Division Assistant Director Joseph Billy, Jr., on the Overseas Arrests of 30 Individuals for Animal Rights Extremism

"Earlier today, law enforcement authorities in the United Kingdom arrested 30 individuals associated with Stop Huntingdon Animal Cruelty (SHAC) and charged them with criminal offenses in furtherance of animal rights extremism.

With our law enforcement counterparts in the U.K., the FBI shares a mutual interest in stemming crimes affiliated with special interest extremism here in the U.S. In attempts to evade law enforcement and newly enacted U.S. legislation targeting their criminal ways, we have seen these individuals seek to act out beyond national boundaries. Additionally, they have sought to alter the means by which they carry out their acts, the persons they try to intimidate, and the areas in which they operate.

The distinctions between constitutionally protected advocacy and violent criminal activity are extremely important to recognize, and law enforcement officials are solely concerned with those individuals who pursue animal rights or environmental protection acts of terrorism through violence and criminal activity.

Today's arrests send a message that criminal activity is not protected on either side of the ocean. The FBI continues to address this kind of criminal activity as a high priority and has forged strong partnerships with our international law enforcement counterparts. When necessary, and to the full extent the law allows, we will share and exchange information with them to target these criminals."

####

---

# EXHIBIT
# 2




HOME BITE BACK MAGAZINE DIARY OF ACTIONS F.A.Q. LIBRARY PRISONERS RESOURCES



BITE BACK
222 Lakeview Ave
Ste. 160-231
West Palm Beach, FL 33401
info@directaction.info

Have something to say?
Let us know!

NEWS FROM THE FRONTLINES



= ARSON = LIBERATION = PICTURES
= PRISONER = SABOTAGE = VANDALISM = VIDEO

May 10, 2007 - UK
**BOAR LIBERATION**

May 9, 2007 - France
**ALF RESCUE FISH**

May 9, 2007 - UK
**WINDOWS PUT THROUGH AT FOIE GRAS RESTAURANT**

May 9, 2007 - Canada
**UPS WINDOWS SMASHED**

May 7, 2007 - France



Exhibit "2"

BITE BACK




»

HOME BITE BACK MAGAZINE DIARY OF ACTIONS F.A.Q. LIBRARY PRISONERS RESOURCES



BITE BACK
222 Lakeview Ave
Ste. 160-231
West Palm Beach, FL 33401
info@directaction.info

NEWS FROM THE FRONTLINES

**DO YOU WANT TO SUBSCRIBE TO BITE BACK?**
Bite Back is a 32 page magazine, full of direct action reports, prisoner news, stories and photos. Subscribe today!

Subscription (four issues): **$15**
Low income/student: **$10**
International: **$20**

We accept check or money order (made out to "Bite Back"), well concealed cash (US or Canadian dollars, Euros or Pounds). Please contact us if you would like to use a credit card.

**ORDERING A SINGLE ISSUE, OR BACK ISSUE**
Single issues and back issues are $3 each. We currently have back issues numbers ~~44~~, 10, 9, 8, and 7 available. Please send a letter describing which issue(s) you would like and the necessary funds. **Update:** Sorry, we have run out of issue no. 11 (we hope to have issue no. 12 out in ~~February~~ March 2007).

**BE A DISTRIBUTOR FOR BITE BACK MAGAZINE!**

Literally every day the brave women and men of the Animal Liberation Front are out liberating, smashing, painting and burning their way across the world for no other reason than to bring us closer to animal liberation!

The least we can do is support their actions.

Do so by distributing Bite Back Magazine in your area! Let local activists know about actions, prisoners they can write to, read heartwarming and inspiring interviews and stories, and most importantly show support for the ALF.

$15 gets you 10 copies of the latest issue (we sell them for $3 a piece). Put them on your tables, in your local stores and distros, or just give them out to friends.

# EXHIBIT
# 3

[illegible]
of right [CPLR 5513 (a)],
you are advised to serve a
copy of this order, with
notice of entry upon all parties.

AND
ENTERED
ON [illegible] 2003
WESTCHESTER
COUNTY CLERK

SUPREME COURT : STATE OF NEW YORK
COUNTY OF WESTCHESTER
PRESENT: **HON. NICHOLAS COLABELLA**
**J.S.C.**

-----------------------------------------------------------------x

HUNTINGDON LIFE SCIENCES, INC. and
MARK L. BIBI,

Plaintiffs,

- against -

STOP HUNTINGDON ANIMAL CRUELTY
(a/k/a SHAC), SHAC USA, ANIMAL DEFENSE
LEAGUE OF LONG ISLAND, ANIMAL DEFENSE
LEAGUE OF NEW JERSEY, ANIMAL DEFENSE
LEAGUE OF NEW YORK, ANIMAL LIBERATION
FRONT, ANDY STEPANIAN, KEVON KJONAAS
(a/k/a KEVIN JONAS), LAUREN GAZZOLA,
and DOES 1-100, Inclusive,

Defendants.

-----------------------------------------------------------------x

**DECISION/ORDER**

**INDEX NO.**
19809/02

**MOTION DATE**
2/7/03

**PLC(PCP)**

The following papers numbered 1-63 were read on motion by plaintiff for a preliminary injunction; motion by defendants SHAC USA and Kjonaas to expedite hearing of motion; cross-motion by defendants SHAC USA and Kjonaas to dismiss; motion by plaintiffs for summary judgment, to amend caption and to direct notice.

| | Papers Numbered |
|---|---|
| Notice of Motion/Order to Show Cause, Affidavits, Exhibits, Memorandum | 1-22/1-5 |
| Notice of Cross-Motion, Affdiavits, Exhibits, Memorandum | 23-28,29-46/ |
| Answering Affidavit, Exhibits | 47-48,49-50/ |
| Reply Affdiavits, Exhibits, Memorandum | 51-54,55,57/ |
| Letters | 1/28/03 [Gazzola] 58-60; 1/28/03 [Stepanian] 61-63 / |

**Exhibit "3"**

Motion by plaintiffs for injunctive relief is granted to the extent that defendants are preliminarily enjoined from commiting or engaging in the conduct proscribed in the November 13, 2002 temporary restraining Order except as permitted therein. The temporary restraining Order is continued pending the disposition of the action or further Order of the Court. The terms of the temporary restraining Order are incorporated herein.[1] The Court dispenses with the fixing of a bond for the reasons discussed below.

Plaintiffs have made a sufficient showing of a likelihood of success on the merits to warrant relief to the extent granted based on prior incidents of violence and harassment and threats of such conduct in the future. There is the possibility of irreparable injury if such relief is not granted, for which there is no adequate remedy at law, and the balancing of equities favor such relief in that the terms and conditions of the injunctive relief granted do not unreasonably interfere with defendants' exercise of first amendment expression. Defendants have no right to engage in the acts set forth in paragraphs 1 and 2 of the temporary restraining Order whereas paragraphs 4 and 5 of the Order do not interfere with defendants' right to protest, but merely set forth a reasonable regulation of the manner in which defendants may do so.[2]

Cross-motion by defendants SHAC USA and Kjonaas for an expedited hearing of plaintiffs' motion for injunctive relief is denied.

Cross-motion by defendants SHAC USA and Kjonaas to dismiss is denied. The complaint states a cause of action.[3]

Cross-motion by plaintiffs insofar as it seeks summary judgment against defendant SHAC USA is denied. There are issues of fact as to defendant's involvement in the conduct alleged.

Motion by plaintiffs insofar as it seeks to amend the caption is granted. The caption shall be amended as to defendant SHAC USA to set forth it's proper name as "Stop Huntingdon Animal Cruelty USA, Inc."

---

[1]The Court declines at this time to direct the relief set forth in paragraph 3 of the temporary restraining Order. That paragraph sought to restrain the dissemination of personal information on SHAC USA's web site. The paragraph was previously stricken by the Court as a prior restraint on future expression.

[2]Defendant SHAC USA contends that it should not be subject to the preliminary injunction as it merely distributes information. This position ignores the statements on the web site in which it states it's support of violent acts committed by other groups.

[3]The Court has not considered the letter requests by pro se defendants to "join in" the cross-motion by defendants SHAC USA and Kjonaas. Motions must be made in conformity with the requirements of the CPLR. Defendants may not obviate those requirements by joining in another party's motion by letter.

Motion by plaintiffs insofar as it seeks a direction that SHAC USA post notice of injunctions is granted to the extent the terms and conditions of the preliminary injunction shall be posted on SHAC USA's web site.

Counsel shall appear for a Preliminary Conference at the Courthouse in the Preliminary Conference Part, rm 806, on 5/29/07 at 9:30 a.m. Plaintiffs' counsel shall serve a copy of this Order on all appearing defendants forthwith.

There shall be no further motions without leave of Court.

Dated: White Plains, New York
4/25/07

Nicholas Colabella
Supreme Court Justice

KURZMAN EISENBERG CORBIN LEVER & GOODMAN, LLP
By: Ross J. Ellick, Esq.
Attorneys for Plaintiffs
One North Broadway
White Plains, NY 10601

ARTHUR MORRISON, ESQ.
Attorney for Defendants SHAC USA and Kjonaas
11 Skyline Drive
Hawthorne, NY 10532

MR. ANDY STEPANIAN
10 Lloyd Point Drive
Huntington, NY 11743

MS. LAUREN GAZZOLA
47 Deer Run
Bethel, CT 06801

# EXHIBIT 4

SHORT FORM ORDER

SUPREME COURT OF THE STATE OF NEW YORK

PRESENT: HON. DANIEL MARTIN
Acting Supreme Court Justice

TRIAL/IAS, PART 34
NASSAU COUNTY

FOREST LABORATORIES, INC. And CHARLES S. RYAN.

Plaintiffs.

Sequence No.: *001 & 002*
Index No.: 006527/05

*- against -*

ANIMAL LIBERATION FRONT, ANIMAL DEFENSE LEAGUE OF LONG ISLAND, ANIMAL DEFENSE LEAGUE OF NEW YORK, STOP HUNTINGDON ANIMAL CRUELTY USA and DOES 1-100, Inclusive.

Defendants.

The following named papers have been read on this motion:

| | Papers Numbered |
|---|---|
| Order to Show Cause and Affidavits Annexed | X |
| Notice of Cross-Motion and Affidavits Annexed | X |
| Answering Affidavits | X |
| Replying Affidavits | X |

Plaintiffs move for a preliminary injunction enjoining defendants herein from 1) harassing, stalking, menacing or attempting to commit any act of violence or threatening to commit any act of violence against any person known or believed to be an employee or agent of plaintiff Forest Laboratories, Inc., or any family member of an employee or agent of plaintiff Forest; 2) trespassing on the real property of, interfering with, vandalizing or damaging the real or personal property of any Forest employee or agent or any family member thereof; 3) placing or maintaining upon any website personal or confidential information regarding any employee or agent of plaintiff Forest or any family member thereof on any website; 4) disseminating any personal or confidential information regarding any Forest employee or agent or any family member thereat; 5) coming within one-hundred feet of the real property of any Forest employee or agent or any family member thereof; and 6) gathering, protesting and/or demonstrating in a group of more than five persons outside of the one-hundred foot zone around the premises of any Forest employee or agent or any family member thereof for in excess of thirty days pending final determination of the instant action. Defendant Stop Huntingdon Animal Cruelty USA, Inc. cross-moves to dismiss the complaint herein as asserted against this defendant pursuant to CPLR 3211(a)(7).

Plaintiff Forest is a pharmaceutical manufacturing company which does business with Huntingdon Life Sciences, Inc., an entity that tests certain products on animals. Plaintiffs allege that they have been the target of a campaign by defendants designed to coerce plaintiff Forest to cease conducting business with Huntingdon. Plaintiff Charles Ryan is Forest's in-house attorney. Defendant Stop Huntingdon Animal Cruelty USA, Inc. (hereinafter "SHAC") is an organization designated to publicize the activities of non-party Huntingdon based upon Huntingdon's alleged cruelty in the testing of various products on animals. In their complaint, plaintiffs allege that in pursuit of their campaign to coerce plaintiff Forest from conducting business with Huntingdon, defendants have engaged in a pattern of harassment and intimidation against plaintiffs.

Plaintiffs commenced the instant action and assert causes of action for 1) tortious interference with employment relations; 2) private nuisance; 3) public nuisance; and 4) intentional infliction of emotional distress. Plaintiffs move for the relief set forth above.

In support of their motion, plaintiffs annex the affidavit of Mr. Ryan in which he avers that defendants over the past five months have engaged in various acts of harassment and intimidation against him and his wife. Specifically, Mr. Ryan cites an occasion when "defendants and their operatives" staged a protest at his home during which his mailbox and a visitor's car were spray-painted in red with the message "Charles Ryan kills kids and puppies." On or around April 22, 2005, Mr. Ryan indicates that on two separate websites, defendants boasted of breaking into his wife's car, their alleged theft of the Ryans' confidential banking and financial information and the eventual theft of $20,000.00. The websites further reveal that (suggests plaintiffs) defendants admit to stealing mail from the Ryans. Further, plaintiffs allege that the postings on the websites contain threats of physical violence to Mr. Ryan and his wife. (See, affidavit of plaintiff Charles Ryan; plaintiffs' exhibit "A").

In opposition to plaintiffs' motion and in support of its cross-motion to dismiss the complaint as asserted against it, defendant Stop Huntingdon Animal Cruelty asserts that none of the allegations contained in plaintiffs' complaint are directed at defendant Stop Huntingdon Animal Cruelty. Specifically, defendant Stop Huntingdon Animal Cruelty claims to be an internet website which exists for the purpose of reporting news by permitting anonymous postings from "NY activists". Counsel for defendant Stop Huntingdon Animal Cruelty argues that plaintiff in both the complaint and the motion merely references acts allegedly committed by defendants as a group without setting forth specific acts committed by specific defendants. Thus, argues defendants Stop Huntingdon Animal Cruelty, the complaint is vague in its allegations against this defendant.

Defendant Stop Huntingdon Animal Cruelty also asserts that the complaint should be dismissed as against this defendant on the basis that the postings on its website are constitutionally protected speech. Stop Huntingdon Animal Cruelty asserts that it merely provides an avenue for the postings of information on this issue on its website and did not incite any individuals who made or read such postings to commit the acts of which plaintiffs complain.



The court shall first determine those branches of defendant Stop Huntingdon Animal Cruelty's cross-motion which seeks dismissal based upon the complaint's purported vagueness.

As set forth above, defendant Stop Huntingdon Animal Cruelty argues that the complaint is vague upon the bases that it merely asserts liability against defendants without specifying which defendant committed which act.

In determining a motion to dismiss a complaint for failure to state a cause of action the court must accept the allegations of the complaint as true and give plaintiffs every favorable inference. Marec v. Lynch, 289 A.D.2d 541 (2nd Dep't 2001). The court disagrees with defendant Stop Huntingdon Animal Cruelty's assertion that the complaint is vaguely pled because its actions may not be discerned from those of the other defendants. Having reviewed the complaint the court notes that plaintiffs allege that defendant Stop Huntingdon Animal Cruelty posted the actions perpetrated against Mr. Ryan set forth above on its website and also encouraged further actions against plaintiff Forest's employees. Such may constitute a viable cause of action. See, e.g., NAACP v. Claiborne Hardware, 458 U.S. 886 (1982). Defendant Stop Huntingdon Animal Cruelty further argues that such postings should not stand to differentiate itself from the other defendants in this action because such communications are constitutionally protected. For the reasons set forth below, the court rejects this position.

The court shall now determine both the plaintiffs' motion for a preliminary injunction and that branch of defendant Stop Huntingdon Animal Cruelty's cross-motion which seeks dismissal on the basis that defendant Stop Huntingdon Animal Cruelty posted constitutionally protected speech.

In order to succeed on a motion for a preliminary injunction, plaintiff must prove 1) a likelihood of success on the merits; 2) irreparable injury in the absence of such relief; and 3) that a balancing of the equities favors granting the relief requested. Aetna Insurance Company v. Capasso, 75 N.Y.2d 860 (1990); J.A. Preston Corporation v. Fabrication Enterprises, Inc., 68 N.Y.2d 397 (1986); W.T. Grant v. Sgroi, 52 N.Y.2d 499 (1980).

In opposition to that portion of defendant Stop Huntingdon Animal Cruelty's motion which is based upon its position that to permit this action would constitute an unconstitutional restriction of its freedom of speech and association, plaintiff argues that 1) the speech which defendant Stop Huntingdon Animal Cruelty seeks to protect is in fact, designed to incite violence and amounts to criminal activity; 2) the order restricting same would be content neutral; 3) the restriction would be narrowly tailored to achieve a vital governmental interest and; 4) there are alternative means of communication.

Generally, "[c]onstitutional guarantees of free speech and press do not permit a state to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action." See, Brandenburg v. State of Ohio, 395 U.S. 444, 447 (1969). The teaching of the moral propriety and/or necessity for violence is not the equivalent of preparing a group for violent action. See, Noto v. United States, 367 U.S. 290 (1961); Brandenburg v. State of Ohio, supra; NAACP v. Claiborne Hardware Co., supra.

It has also been held, however, that whether speech which advocates violence is

4

constitutionally protected or is an unprotected threat which makes the listener fear he will be subjected to physical violence, is to be determined based upon the circumstances surrounding the expression employed. See, Planned Parenthood of the Columbia/Williamette, Inc. v. American Coalition of Life Activists, 290 F.3d 1058 (CA 9th Cir). In Columbia/Williamette, the United States Court of Appeals was faced with the issue of defining the term "threat of force" in construing the Freedom of Access to Clinics Entrance Act, a statute which provides a civil cause of action for the use of violence or threats of violence against those who provide reproductive medical services. See, 18 U.S.C. §248(d)(1). Plaintiffs were various organizations and doctors who performed abortions and sought enforcement of the statute against certain anti-abortion organizations who posted the doctors' names and addresses on posters on the internet. The posters also included rhetoric, *inter alia*, that said doctors were guilty of crimes against humanity. Three doctors who performed abortions as part of their respective practices were murdered after their faces appeared on posters posted by the defendants therein.

The ninth circuit, in order to determine if the defendants violated the act, had to determine whether the communications made by the defendants were constitutionally protected speech as set forth in Bradenburg, or whether it was a true threat which, pursuant to Watts v. United States, 394 U.S. 705 (1969), is not constitutionally protected. Columbia/Williamette, supra, 1072. The court engaged in an analysis in which the alleged threat was "considered in light of [its] entire factual context, including the surrounding events and reactions of the listeners (citations omitted)". Id, 1074. The court went on to hold that such a true, unprotected threat exists where a reasonable person could foresee that the listener will believe he will be subjected to physical violence upon his person (citations omitted)." Id, 1075.

It bears noting that this same analysis was found to be applicable in Huntingdon Life Sciences, Inc. et al v. Stop Huntingdon Animal Cruelty, et al, (San Diego County Superior Court, Index No.: GIC812248). Defendant Stop Huntingdon Animal Cruelty USA, Inc. was a defendant in that action as it is in this one. In that action, plaintiffs asserted causes of action for, *inter alia*, trespass, harassment, intentional infliction of emotional distress, etc. The Court of Appeals of California, Fourth Appellate District, Division One, in affirming in part and reversing in part a Superior Court decision which denied defendants' motion to dismiss the complaint, held that the Superior Court could reasonably have held that the Stop Huntingdon Animal Cruelty website contained credible threats of violence against Huntingdon Life Sciences, Inc.'s employees. The information posted on Stop Huntingdon Animal Cruelty's website was of the same tenor as that which was allegedly posted about Mr. Ryan herein. See, Huntingdon Life Sciences, Inc. v. Stop Huntingdon Animal Cruelty USA, Inc., 129 Cal.App. 4th 1228 (2005).

Although both the Columbia/Williamette and Huntingdon cases discussed above involved causes of action based upon anti-harassment statutes, the fact remains that in both cases the court had to determine what constitutes a constitutionally protected advocacy of violence as opposed to a constitutionally unprotected threat. The court finds the analysis applied in both cases to be applicable herein. Although there are no overt threats to plaintiffs contained on the website, defendant Stop Huntingdon Animal Cruelty still provides those who allegedly have committed violent and/or illegal acts against Mr. Ryan with an outlet to record and report their activities as well as to encourage others to do so. Further, such information as the address of his residence is

posted on the site. Such could lead to others to engage in such behavior in the future and further, provides the location of plaintiff Forest's employees.

Accordingly, based upon the foregoing the court concludes that plaintiffs have demonstrated a likelihood of success on the merits on their motion for a preliminary injunction and the court denies that branch of defendant Stop Huntingdon Animal Cruelty's motion to dismiss based upon its position that the postings on its website are constitutionally protected speech.

The court further finds that in the absence of such relief plaintiffs would suffer irreparable injury, *i.e.* personal injury or property damage as a result of defendants' activities.

A balancing of the equities also favors granting plaintiffs the relief sought herein. Any inconvenience experienced by defendant by such an injunction is far outweighed by the injuries that could be suffered by plaintiffs were defendants not enjoined from engaging in such activities.

The court now turns its attention to plaintiff's motion for a preliminary injunction against the remaining defendants herein. Defendants Peri Henschel and Laura Lungarelli are the only other defendants who attempt to submit opposition to plaintiffs' motion. The court shall not review defendant Lungarelli's opposition as same is an unsworn letter and is therefore not in admissible form. Defendant Henschel submits what the court will accept as an affidavit, as same is at least sworn to (although parenthetically the document reflects that same is "swomed" to) and notarized.

In her opposition, Ms. Henschel asserts that

1) she has not attended any protests against Forest since January, 2005 and is no longer affiliated with defendant Animal Defense League of Long Island;

2) she will have no contact with plaintiffs, will comply with any injunction and will not be involved with any protest against plaintiffs; and

3) she expresses her sympathy for plaintiffs.

The court can only conclude that Ms. Henschel concedes to any injunction issued herein.

Accordingly, the court grants plaintiffs a preliminary injunction against all remaining defendants to the extent that it hereby directs all defendants herein, as well as their members, supporters, officers, agents, servants, employees, representatives, affiliates and all persons acting in concert and participation with them during the pendency of this action from:



1) harassing, stalking, menacing or committing or attempting to commit any act of violence, or making any overt or implicit threat of violence against any person, or any person known or believed to be a family member of any Forest employee or agent, past or present;

2) trespassing on the real property of, or interfering with, vandalizing or damaging the real or personal property of any person known or believed to be a Forest employee or agent, past or present, or any person known or believed to be a family member of any Forest employee or agent, past or present;

3) coming within one hundred (100) feet of any real property known or believed to be lawfully in the possession of any person known or believed to be a Forest employee or agent, past or present, or of any person known or believed to be a family member of any Forest employee or agent, past or present;

4) placing or maintaining upon any website personal or confidential information regarding any employee or agent of plaintiff Forest or any family member thereof on any website; and

5) disseminating any personal or confidential information regarding any Forest employee or agent or any family member thereat.

The motion is otherwise denied.

Plaintiffs are hereby directed to post a bond as an undertaking in the amount of $10,000.00. CPLR 6312.

So Ordered.

[signature]
A.J.S.C.

Dated: December 23, 2005

ENTERED
JAN 12 2006
NASSAU COUNTY
COUNTY CLERK'S OFFICE

# EXHIBIT
# 5

| | | |
|---|---|---|
| **SMITHKLINE BEECHAM CORPORATION, d/b/a/ GLAXOSMITHKLINE, et al.,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**STOP HUNTINGDON ANIMAL CRUELTY USA, INC., et al.,**<br><br>**Defendants.** | : | **COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY**<br><br>**NOVEMBER TERM, 2006**<br><br>**NO: 0366**<br><br>**(IN EQUITY)** |

**INJUNCTION ORDER**

AND NOW, this 27th day of November, 2006, upon consideration of the Complaint in Equity, Petition for Special and Preliminary Injunction, the accompanying papers in support thereof filed by plaintiffs SmithKline Beecham Corporation d/b/a GlaxoSmithKline ("GSK"), and the Individual Plaintiffs and the evidence and argument entered upon the record, and, after consideration of any responses made thereto by defendants Stop Huntingdon Animal Cruelty USA, Inc., Hugs for Puppies, Inc., Nicholas Cooney, David Lambon, Christopher Semick, and Amandah Povilitus, it is hereby determined that:

1. Plaintiffs have demonstrated a clear right to relief on the merits of the claims in their Complaint;

2. An injunction is necessary to abate defendants' unlawful conduct and is reasonably suited to abate such unlawful conduct;

3. The injunction is in the public interest; and

4. Plaintiffs have no adequate remedy at law;

DMEAST #9672754 v1

Exhibit "5"

WHEREFORE, it is hereby ORDERED and DECREED that:

5. The above named defendants, individually and collectively, and all persons acting in any manner at their behest or in concert with them, directly or indirectly, are hereby ENJOINED from:

(a) committing any act of violence or making any threat of violence against GSK, the Individual Plaintiffs and/or any person otherwise affiliated with or providing goods or services to GSK and the Individual Plaintiffs, including any person known or believed to be a GSK employee;

(b) vandalizing, damaging, or threatening to vandalize or damage real or personal property belonging to GSK, the Individual Plaintiffs and/or any person otherwise affiliated with or providing goods or services to GSK and the Individual Plaintiffs, including any person known or believed to be a GSK employee;

(c) harassing, stalking, menacing, intimidating GSK, the Individual Plaintiffs and/or any person otherwise affiliated with or providing goods or services to GSK and the Individual Plaintiffs, including any person known or believed to be a GSK employee;

(d) trespassing, entering, coming onto, or interfering with the use and enjoyment of any real property owned, occupied, or in the possession of GSK, the Individual Plaintiffs and/or any person otherwise affiliated with or providing goods or services to GSK and the Individual Plaintiffs, including any person known or believed to be a GSK employee;

(e) violating any Ordinances in effect within the relevant jurisdiction or any other similar local regulation regarding noise, disturbing the peace, property damage, impeding or obstructing the free passage of pedestrians, and/or the distribution of flyers or handbills;

(f) placing or maintaining upon any website or otherwise disseminating any private or personal information, including but not limited to, names, home addresses, home phone numbers, mobile phone numbers, e-mail addresses, bank account numbers, credit card numbers, social security numbers, vehicle license plate numbers, or drivers' license numbers, regarding GSK, the Individual Plaintiffs and/or any person otherwise affiliated with or providing goods or services to GSK and the Individual Plaintiffs, including any person known or believed to be a GSK employee;

(g) making any phone calls, sending any email messages, or otherwise sending communications of a threatening or harassing nature, or directing, causing or inducing or encouraging others to make any phone calls, send any email messages, or otherwise send communications of a threatening or harassing nature to GSK's offices, the Individual Plaintiffs and/or any person otherwise affiliated with or providing goods or services to GSK and the Individual Plaintiffs, including any person known or believed to be a GSK employee;

(h) in any manner whatsoever engaging in any picketing, demonstrating, leafleting, protesting or congregating within ~~one hundred (100)~~ fifty (50) feet of the walk-in and drive-through gates reserved for employees of GSK, the public wishing to do business with GSK and other personnel at GSK's facilities, or otherwise preventing or obstructing any ingress or egress of people, vehicles, or any deliveries to or from GSK's facilities;

(i) in any manner whatsoever engaging in any picketing, demonstrating, leafleting, protesting or congregating, except as provided in (h) above,

(i) within one hundred (100) feet of the aforementioned locations, except as provided in (h) above;

(ii) in a group of more than 10 persons;

(iii) more than once every other week;

(iv) for more than one hour;

(v) outside of 9 a.m. to 5 p.m., Monday through Friday;

(vi) on any federal or state holiday;

(vii) with any amplification device, including but not limited to bullhorns;

(viii) wearing masks, bandanas, hoods, or other items intended to cover faces and conceal identities; and

(ix) without notifying the relevant law enforcement organization at least 72 hours in advance of any such protest of the time of the protest, the number of protestors, and the anticipated duration of the protest;

(j) in any manner whatsoever engaging in any picketing, demonstrating, leafleting, protesting or congregating within one hundred (100) feet of the homes of the Individual Plaintiffs and/or any person otherwise affiliated with or providing goods or services to GSK and the Individual Plaintiffs, including any person known or believed to be a GSK employee;

(k) in any manner whatsoever engaging in any picketing, demonstrating, leafleting, protesting or congregating at the homes of any of the Individual Plaintiffs and/or any person otherwise affiliated with or providing goods or services to GSK and the Individual Plaintiffs, including any person known or believed to be a GSK employee:

(i) within one hundred (100) feet of the aforementioned homes;

(ii) in a group of more than 5 persons;

(iii) more often than once every other week;

(iv) for more than one hour;

(v) outside of 10 a.m. to 12 p.m., Monday through Friday;

(vi) on any federal or state holiday;

(vii) with any amplification device, including but not limited to bullhorns;

(viii) wearing masks, bandanas, hoods, or other items intended to cover faces and conceal identities; and

(ix) without notifying the appropriate law enforcement organization at least 72 hours in advance of any such protest of the time of the protest, the number of protestors, and the anticipated duration of the protest;

(l) in any manner whatsoever engaging in any action or conduct which is intended to or has the necessary effect of threatening, intimidating, harassing or coercing the Individual Plaintiffs and/or any person otherwise affiliated with or providing goods or services to GSK and the Individual Plaintiffs, including any person known or believed to be a GSK employee;

(m) in any manner whatsoever interfering with, hindering or obstructing the ingress and egress to GSK's facilities;

6. That defendants, each of them, and their members, supporters, officers, agents, employees, representatives, affiliates, and all persons acting in concert with them, shall post on all websites owned, operated or controlled by any of the defendants, which relate to animal rights or a campaign against HLS, the following language in a font no smaller than ten points and in a location conspicuously visible to all visitors on the front or "home" page: "Notice: The Court of Common Pleas of Philadelphia County, Pennsylvania has issued an order prohibiting certain activity relating to GlaxoSmithKline, and persons or entities having business

or economic relations with GlaxoSmithKline"; and post the foregoing statement as a continuously visible underlined hyperlink which, when clicked, displays only a legible PDF copy of all pages of this Order, complete and unmodified, except that the names of the Individual Plaintiffs shall be redacted therefrom;

7. That no person who has notice of the relief described above shall fail to comply with its letter and spirit nor shall any person subvert the letter or spirit by any sham, indirection or other artifice;

8. The Sheriff's Office of Philadelphia County and/or the Individual Plaintiffs and GSK through their attorneys, or any competent adult authorized by the Individual Plaintiffs and GSK, are authorized to serve true but uncertified copies of the complaint and injunction upon any of the defendants and upon any persons acting in concert with them or otherwise participating with them or acting in their aid or on their behalf.

9. The Court shall retain jurisdiction over the complaint to determine that the decree of this Court is obeyed and the Sheriff's Office of Philadelphia County or any other law enforcement agency having jurisdiction over the enjoined parties are hereby authorized and directed to enforce this Special Injunction Order by whatever lawful means deemed appropriate, and to arrest and bring before this Court on charges of contempt any and all persons interfering with the enforcement of the Order.

10. This Order shall have full effect both within and outside the territorial limits of the Commonwealth of Pennsylvania.

10. Any violation of this Order shall result in the imposition of a fine not less than $500.00 for each such violation.

BY THE COURT:

Hon. Gary DiVito, J.

# EXHIBIT
# 6

**SUPREME COURT OF THE STATE OF NEW YORK – NEW YORK COUNTY**

**PRESENT:** **DEBRA A. JAMES**
***Justice***

**PART 59**

HUNTINGDON LIFE SCIENCES, INC. and LIFE SCIENCES RESEARCH, INC.

Plaintiffs,

- v -

WIN ANIMAL RIGHTS, an unincorporated asscciation, CAMILLE HANKINS, individually and in her capacity as President and/or Treasurer of WIN ANIMAL RIGHTS, GREG NOVARA, a/k/a GREG KELLY, individually and/or as Treasurer of WIN ANIMAL RIGHTS, and DOES 1-100, Inclusive,

Defendants.

Index No.: 602313/06

Motion Date: 10/03/06

Motion Seq. No.: 1

Motion Cal. No.: ________

The following papers, numbered 1 to _550__ were read on this motion / petition for
________________________________________ .

| | PAPERS NUMBERED |
|---|---|
| Order to Show Cause -Affidavits -Exhibits | 1-480 |
| Answering Affidavits - Exhibits | 481-500 |
| Replying Affidavits - Exhibits | 501-550 |

**Cross-Motion:** ☐ **Yes** ☒ **No**

MOTION/CASE IS RESPECTFULLY REFERRED TO JUSTICE FOR THE FOLLOWING REASON(S):

Upon the foregoing papers, plaintiffs' motion for a preliminary injunction must be GRANTED in part.

Plaintiff Huntingdon Life Sciences, Inc. ("HLS"), is a corporation organized under the laws of the State of Delaware, with its principal place of business located in New Jersey. Its business is to conduct safety testing, which is primarily government mandated, on pharmaceutical, bio technical and agrochemical products in order to identify risks to humans, animals and the environment. Plaintiff Life Sciences Research, Inc. ("LSR") is a corporation organized under the laws of the

**Check One:** ☐ **FINAL DISPOSITION** ☒ **NON-FINAL DISPOSITION**

**Check if appropriate:** ☐ **DO NOT POST** ☐ **REFERENCE**

**Exhibit "6"**

State of Maryland, with its principal place of business located in New Jersey. which is a publicly traded holding company that owns 100% of the issued and outstanding common stock of plaintiff HLS.

Defendant Win Animal Rights ("WAR") is an unincorporated voluntary association. Its literature describes WAR as a "national non-profit organization dedicated to eliminating the exploitation and suffering of animals, while promoting and defending...their inherent rights," whose objective is "to engage in a campaign to stop the killing of animals at Huntingdon Life Sciences." Defendants Camille Hankins and Greg Novara are sued individually and as officers or other principals of WAR.

In their Complaint, HLS and LSR seek permanent injunctive relief in connection with their claim that defendants are tortiously interfering with contracts and tortiously interfering with prospective economic advantage. In sum, plaintiffs claim that defendants are using unlawful methods and tactics, including intimidation and invasion of privacy of persons who are plaintiffs' market makers, investors, customers and suppliers through harassing telephone calls to and confrontational demonstrations outside of such individual's personal residences. Plaintiffs allege that the sole objective of campaign is to fatally injure or harm plaintiffs' business.

Plaintiffs move for a preliminary injunction with respect to defendants actions against these third party business relations.

On June 29, 2006, plaintiffs presented a Show Cause Order to Justice Herman Cahn. The proposed Order did not contain a temporary restraining order, and was signed by the judge. Plaintiffs sought to amend such Order to provide for a temporary restraining order, which was preliminarily denied by Judge Cahn,

who for thereafter recused himself. On August 2, 2006, Justice Helen Freedman signed another Show Cause Order, which contained a temporary restraining order that provided that pending the hearing and determination of the motion for a preliminary injunction, with respect to any person or entity having an existing or prospective business or economic relation with plaintiffs, defendants were enjoined from, inter alia, harassing, stalking, intimidating, menacing, by telephone or personally, trespassing on the real property or personal property or coming within front or within twenty feet of any real property known or believed to be lawfully in the possession of, blocking or attempting to block any internet website or other electronic communication system of any such person.

By this Show Cause, plaintiffs seek to extend the temporary restraining order to a preliminary injunction with respect to such third parties.

Defendants argue that plaintiffs' claims and complaint unfairly and improperly attribute the actions of another organization named "Stop Huntingdon Animal Cruelty" ("SHAC") and SHAC USA to defendant WAR and its leaders. They further argue that their demonstrations and campaign constitute speech protected from restraint by the First Amendment of the United States Constitution. Finally, defendants contend that plaintiffs are unable to demonstrate a likelihood of success on the merits, irreparable harm in the absence of injunctive relief, and a weighing of equities in their favor, which are the burden of plaintiffs to show on a motion for equitable preliminary relief. Bingham v. Struve, 184 A.D.2d 85, 88 (1st Dept. 1992).

As to the last argument, the affidavit of Mark L. Bibi, general counsel of Huntingdon Life Sciences, Inc., which is the only affidavit of a person with personal knowledge of the facts submitted on plaintiffs' application, relies heavily on his

recounting of the history of SHAC, and what Bibi characterizes as its illegal campaign of terror tactics, which were designed to cause HLS and LRS's demise. Defendants do not contest Bibi's statement that in September 2005, individual leaders of SHAC were indicted for federal crimes, for which they were convicted in May 2006, and await sentencing in September 2006.

Bibi alleges, in his affidavit, that in a pending action against SHAC in the New York State Supreme Court, Westchester County, Justice Colabella has issued a preliminary injunction imposing time, place and manner restrictions upon defendants' protests at his home. He recounts a protest that took place outside of his home on October 12, 2002, as well as additional acts of trespass, and acts of vandalism and threats against he and his family in November 2002, which resulted in the issuance of the injunction.

In support of his position that this court ought to issue an injunction with respect to defendants acts against third parties, Bibi alleges that WAR was organized shortly after the indictments against SHAC's leadership, "to carry on the business of SHAC". Specifically, he alleges that after the 2004 indictments, defendant Hankins began appearing and engaging in demonstrations outside the residence of Andrew Baker, HLS's Chairman and CEO. He attaches a copy of an Order of Protection dated April 26, 2006 that was issued by the New York City Criminal Court against Hankins, which orders Hankins to stay away from Baker, his home, his business, his place of employment.

He also describes other incidents that took place shortly after the indictment of the several SHAC leaders. He cites the Congressional hearing testimony of Stephen Boruchin, a principal of Legacy Trading Company, HLS's largest investor, in which Mr Boruchin described a "campaign of sheer terror" undertaken by SHAC in December 2004 that caused drastic changes

in his family's daily lives.

Finally Bibi affirms that in October 2005, the names, home telephone numbers and e-mail address of executives and other employees of Dalton, Greiner, LLC, another of HLS's market makers, were posted on WAR's website, which also posted personal information for board members of other boards, including a nonprofit children's theater, on which Dalton, Greiner, LLC sits. WAR also carried out demonstrations in front of Kenneth Greiner's home, Dalton, Greiner, LLC's principal.

The balance of Bibi's affidavit describes the alleged economic damage resulting from defendants acts suffered by plaintiffs, including the postponement of the listing of LSR's stock on the New York Stock Exchange, a devaluation and decline in value of LSR stock, the loss of LSR's largest institutional investor, the loss of LSR's market makers and the loss of plaintiffs' customer base.

While the court cannot and does not impute defendants for the prior bad acts of SHAC, a non-party to this action, defendant WAR's own literature admits certain tactics that it has undertaken that constitute tortious acts on the part of defendant WAR and its officers and members themselves.

Such tactics involve the physical pursuit, literally "where they live", and the posting of personal information in a public forum of persons with whom plaintiffs have a business relationship or prospective business relationship.

In Trojan Electric & Machine Company, Inc. V. Heusinger, 162 AD2d 859 (1st Dept. 1990), the court stated

> The devastating effect of targeted picketing on the quiet enjoyment of a home is beyond doubt and such offensive speech may be resisted when it intrudes upon a captive audience."

The Trojan Electric court also stated that an injunction to redress a private wrong does not constitute one to

suppress public expression where the "words and conduct of the defendant were obviously designed and put into effect for the purpose of intimidating the plaintiff and coercing settlement of a claim by adversely affecting its business venture." 162 AD2d 859 (1st Dept.) See also Ansonia Associates Limited Partnership, 253 AD2d 706 (1st Dept. 1998).

Plaintiffs have made a prima facie showing of a likelihood of success on the merits of their tort claims of interference with contractual relations and interference with contract or with prospective economic advantage, since plaintiffs' evidence includes purported statements on defendants own website that the demonstrations at the residences of plaintiffs' business relations are aimed at discouraging and disrupting those relations. That defendant Hankins pledges that she no longer wishes to pursue that objective is a concession that such unlawful objective was sought at the time plaintiffs made the application at bar.

As to irreparable harm, that the loss of their largest institutional investor occurred after defendants dissemination of his personal contact information on its website is sufficient to establish irreparable harm should defendants' efforts to disrupt the personal lives of plaintiffs' business relations be allowed to continue pending the resolution of this lawsuit.

While the defendants at bar certainly have a right of

free expression,

> their rights must be balanced with the other private and governmental interests involved. Reasonable time, place and manner regulations have been consistently upheld when they are necessary to further significant governmental interest, when they do not regulate the content of speech, and when they leave open alternative means of communication (citations omitted)."

Parkmed Company v Pro-Life Counseling, Inc., 91 AD2d 551, 552 (1st Dept. 1982).

The language in the temporary restraining order meets such criteria. Restrictions on defendants' publication of the names and personal home addresses, telephone, fax numbers and email addresses of the principals of plaintiffs' various investing and market making entities do not impinge upon defendants' right of free expression. Restrictions on their calls to the homes of such persons are "to redress a private wrong and not to suppress public expression." Trojan, supra, at p. 860. Finally, the buffer zone limitation strikes a reasonable balance between the defendants' constitutional First Amendment rights and the those of business relations to the quiet enjoyment of their homes.

Accordingly, it is hereby,

ORDERED that plaintiffs' application for a preliminary injunction is GRANTED to the extent that pending the resolution of this action, defendants are hereby enjoined from

(i) harassing, stalking, intimidating, menacing or committing or attempting to commit any act of violence, or making any overt or implicit threat of violence against any employee,

consultant, independent contractor or director of Huntingdon Life Sciences, Inc. or Life Sciences Research, Inc. or any entity known or believed to have business or economic relations with HLS or LSR, or known or believed to have a prospective business relationship with Huntingdon Life Sciences, Inc. or Life Sciences Research, Inc., including, but not limited to market makers, investors, customers and suppliers, or against any person known or believed to be a family member of any such person;

(ii) trespassing on the real property of, or interfering with, vandalizing or damaging the real or personal property of any employee, consultant, independent contractor or director of Huntingdon Life Sciences, Inc. or Life Sciences Research, Inc. or any entity known or believed to have business or economic relations with Huntingdon Life Sciences, Inc. or Life Science Research, Inc. or known or believed to have a prospective business relationship with Huntingdon Life Sciences, Inc. or Life Sciences Research, Inc. including, but not limited to market makers, investors, customers and suppliers, or against any person known or believed to be a family member of any such person action,

(iii) placing or maintaining upon any website, or disseminating electronically over the internet, by e-mail or otherwise, any personal or any other confidential information regarding any employee, consultant, independent contractor or director of Huntingdon Life Sciences, Inc. or Life Sciences

Research, Inc. or any entity known or believed to have business or economic relations with Huntingdon Life Sciences, Inc. or Life Sciences Research, Inc., or known or believed to have a prospective business relationship with Huntingdon Life Sciences, Inc. or Life Sciences Research, Inc. including, but not limited to market makers, investors, customers and suppliers, or against any person known or believed to be a family member of any such person;

(iv) coming in front or within forty-five feet of any real property known or believed to be lawfully in the possession of any employee, consultant, independent contractor or director of Huntingdon Life Sciences, Inc. or Life Sciences Research, Inc. or any entity known or believed to have business or economic relations with HLS or LSR, or known or believed to have a prospective business relationship with Huntingdon Life Sciences, Inc. or Life Sciences Research, Inc., including, but not limited to market makers, investors, customers and suppliers, or against any person known or believed to be a family member of any such person;

(v) making any phone calls of a threatening nature, or directing, causing, inducing or encouraging others to make any phone calls of a threatening or harassing nature, to the offices of Huntingdon Life Sciences, Inc. or Life Sciences Research, Inc., or to the offices of any entity known or believed to have business or economic relations with Huntingdon Life Sciences,

Inc. or Life Sciences Research, Inc. or known or believed to have a prospective business or economic relationship with Huntingdon Life Sciences, Inc. or Life Sciences Research, Inc., including but not limited to market makers, investors, customers and suppliers;

(vi) blocking or attempting to block the internet website, e-mail, facsimile or telephone lines of any entity known or believed to have business or economic relations with Huntingdon Sciences Research, Inc. or Life Sciences Research, Inc. or known or believed to have a prospective business or economic relationship with Huntingon Life Sciences, Inc. or Life Sciences, Research, Inc. including but not limited to market makers, investors, customers and suppliers,

(vii) gathering, protesting and/or demonstrating in a group of more than fifteen people outside of the place of business any entity known or believed to have business or economic relations with Huntingdon Life Sciences, Inc. or Life Sciences Research, Inc., or known or believed to have a prospective business or economic relationship with Huntingdon Life Sciences, Inc. or Life Sciences Research, Inc., including but not limited to market makers, investors, customers and suppliers; and it is further

ORDERED that pending the disposition of this action, defendants, each of them, and their members, agents, employees, representatives, supporters and all persons acting in concert and

participation with them or with actual notice of this order, be and hereby are required to provide forty-eight (48) hours notice of any intended demonstration, gathering and/or protest outside of the offices of any entity known or believed to have business or economic relations with Huntingdon Life Sciences, Inc. or Life Sciences Research, Inc., or known or believed to have a prospective business or economic relationship with Huntingdon Life Sciences, Inc. or Life Sciences Research, Inc., including but not limited to market makers, investors, customers and suppliers, to the appropriate police department of the township, municipality or borough that has jurisdiction over such business location, and it is further

ORDERED that the parties shall appear for a preliminary conference on Tuesday, April 24, 2007, 9:30 AM, at IAS Part 59, Room 1254 of 111 Centre Street.

This is the decision and order of the court.

**Dated:** April 9, 2007

ENTER:

J.S.C.

**DEBRA A. JAMES**
**J.S.C.**

# EXHIBIT
# 7

FILED
AUG 04 2006
Peter E. Doyne, P.J.S.C.

Our File No: C13599
**DIFRANCESCO, BATEMAN, COLEY, YOSPIN, KUNZMAN, DAVIS & LEHRER, P.C.**
15 Mountain Blvd.
Warren, New Jersey 07059
(908) 757 - 7800
Attorneys for plaintiff Rotenberg Meril Solomon Bertiger & Guttilla, P.C.

| | |
|---|---|
| ROTENBERG MERIL SOLOMON BERTIGER & GUTTILLA, P.C., Plaintiff, v. STOP HUNTINGDON ANIMAL CRUELTY, a/k/a SHAC; WIN ANIMAL RIGHTS, a/k/a WAR; NICHOLAS COONEY, a/k/a NICK COONEY; HUGS FOR PUPPIES; CLOSE HLS; JANE DOES 1-100, NAMES BEING FICTITIOUS; RICHARD ROES, 1-100, NAMES BEING FICTITIOUS, Defendants. | SUPERIOR COURT OF NEW JERSEY CHANCERY DIVISION: BERGEN COUNTY<br>DOCKET NO: C-264-06<br>CIVIL ACTION<br>**ORDER TO SHOW CAUSE WITH TEMPORARY RESTRAINTS** |

**THIS MATTER** having been opened to the Court upon the application of DiFrancesco, Bateman, Coley, Yospin, Kunzman, Davis & Lehrer, P.C., (David P. Wadyka, Esq., appearing), attorneys for plaintiff Rotenberg Meril Solomon Bertiger & Guttilla, P.C. ("RMSB&G"); and defendants, Stop Huntingdon Animal Cruelty, a/k/a SHAC, Win Animal Rights, a/k/a WAR, Nicholas Cooney, a/k/a Nick Cooney; Hugs For Puppies, Close HLS, Jane Does 1-100 and Richard Roes 1-100, Names Being Fictitious, having been notified of the within application; and the Court having

PD

{A0422869.DOC/DPW}

Exhibit "7"

considered the plaintiff's Verified Complaint, the Certifications annexed thereto, and brief in support thereof; and for other good cause having been shown;

It is on this 4th day of August, 2006;

**ORDERED** that defendants, ~~Stop Huntingdon Animal Cruelty, a/k/a SHAC~~, Win Animal Rights, a/k/a WAR, Nicholas Cooney, a/k/a Nick Cooney, Hugs For Puppies, ~~Close HLS~~, ~~Jane Does 1-100 and Richard Roes 1-100, Names Being Fictitious~~, show cause before this Court, located at the Justice Center, 10 Main Street, Room 323 Hackensack, Bergen County, on the 8th day of September, 2006 at 9 A.M. ~~P.M.~~, or as soon thereafter as counsel may be heard, as to why the relief demanded in the plaintiff's Verified Complaint should not be granted as follows:

1. Defendants, jointly and severally, and all persons or entities acting with them or under their control or direction, and their agents, employees, representatives, supporters, and all persons acting in concert and in participation with them be enjoined from committing or furthering the commission of any of the following acts:

   A. Demonstrating or protesting at the business premises of RMSB&G, or any person known or believed to be a current or former employee of RMSB&G, or any person known or believed to be a family member, friend, client, vendor, affiliate or business associate of any RMSB&G current or former employee without meeting the reasonable time, place and manner descriptions set forth at 1.J. below;

{A0422888.DOC/OPW}

B. Demonstrating or protesting at or near any real property known or believed to be lawfully in the possession of any current or former RMSB&G employee, or any person known or believed to be a family member, friend, client, vendor, affiliate or business associate of any RMSB&G current or former employee without meeting the reasonable time, place and manner restrictions set forth at 1.J. below;

C. Approaching any person known or believed to be a current or former employee of RMSB&G, or any person known or believed to be a family member, friend, client, vendor or business associate of any RMSB&G current or former employee;

D. Placing or maintaining upon any web site any information regarding any person known or believed to be a RMSB&G current or former employee of RMSB&G, or any person known or believed to be a family member, friend, client, vendor, affiliate or business associate of any RMSB&G current or former employee;

E. Making harassing or threatening phone calls to the home or cell phones of any person known or believed to be a current or former employee of RMSB&G, or any person known or believed to be a family member, friend, client, vendor, affiliate or business associate of any RMSB&G current or former employee;

F. Sending any harassing or threatening e-mail to any account owned or maintained for the benefit of RMSB&G (including but not limited

to all accounts ending with "@rmsbg.com"), or to any e-mail account owned by or maintained for the benefit of any person known or believed to be a current or former employee of RMSB&G, or any person known or believed to be a family member, friend, client, vendor, affiliate or business associate of any RMSB&G current or former employee;

G. Committing any act of violence or making any overt or implicit threat of violence against any person known or believed to be a current or former employee of RMSB&G, or any person known or believed to be a family member, friend, client, vendor, affiliate or business associate of any RMSB&G current or former employee;

H. Attempting to block the Internet web site, e-mail, facsimile lines or telephone lines of RMSB&G or any person known or believed to be a current or former employee of RMSB&G, or any person known or believed to be a family member, friend, client, vendor, affiliate or business associate of any RMSB&G current or former employee;

I. Screaming, shouting, yelling, amplifying sounds with electronic equipment or otherwise causing or creating any loud disturbing or annoying noise at or near the home of any person known or believed to be a current or former employee of RMSB&G, or any person known or believed to be a family member, friend, client, vendor, affiliate or business associate of any RMSB&G current or former employee.

J. Imposing the following reasonable time, place and manner restrictions upon the defendants' "protests" as may be reasonable and necessary to prevent any person known or believed to be a current or former employee of RMSB&G, or any person known or believed to be a family member, friend, client, vendor, affiliate or business associate of any RMSB&G current or former employee from suffering further injury:

1. Requiring defendants to notify the police department of the township, municipality or borough of any intended protest or demonstration at the home or business premises of any person known or believed to be a current or former employee of RMSB&G, and the home or business premises of any person known or believed to be a family member, friend, client, vendor, affiliate or business associate of any RMSB&G current or former employee at least seventy-two (72) hours prior to any intended protest or demonstration pursuant to this injunction of the number of protestors and of the time and duration of the intended protest;

2. Requiring defendants to protest in a group of no more than fifteen (15) persons outside the 100-foot zone around the home or business premises of any person known or believed to be a current or former employee of RMSB&G, or any person known to be a family member, friend, client, vendor,

affiliate or business associate of any RMSB&G current or former employee for no more than ninety (90) minutes every two weeks; and

K. Granting such other and further relief, including but not limited to attorneys' fees and costs, as the Court may deem just and appropriate; and

**IT IS FURTHER ORDERED** that a Temporary Restraining Order, effective immediately as of the date of this Order to Show Cause, and to continue, remaining in full force and effect until such time as the Court has issued a final ruling on plaintiff's application for a Preliminary Injunction, defendants, ~~Stop Huntingdon Animal Cruelty, a/k/a SHAC~~, Win Animal Rights, a/k/a WAR, Nicholas Cooney, a/k/a Nick Cooney, Hugs For Puppies, ~~Close HLS, Jane Does 1-100 and Richard Roes 1-100, Names Being Fictitious~~, jointly and severally, and all persons or entities or under their control or direction, and all persons acting in concert and in participation with them are hereby enjoined from committing or furthering the commission of any of the following acts:

A. Demonstrating or protesting at the business premises of RMSB&G, or any person known or believed to be a current or former employee of RMSB&G, or at the premises of any person known or believed to be a family member, client, vendor, affiliate or business associate of any RMSB&G current or former employee without meeting the reasonable time, place and manner descriptions set forth below;

B. Approaching any person known or believed to be a current or former employee of RMSB&G, or any person known or believed to be a family

member, ~~friend~~, client, vendor or business associate of any RMSB&G current or former employee;

C. Making harassing or threatening phone calls to the home or cell phones of any person known or believed to be a current or former employee of RMSB&G, family member or any person known or believed to be a family member, ~~friend~~, client, vendor, affiliate or business associate of any RMSB&G current or former employee;

D. Sending any harassing or threatening e-mail to any account owned or maintained for the benefit of RMSB&G (including but not limited to all accounts ending with "@rmsbg.com"), or to any e-mail account owned by or maintained for the benefit of any person known or believed to be a current or former employee of RMSB&G, or any person known or believed to be a family member, ~~friend,~~ client, vendor, affiliate or business associate of any RMSB&G current or former employee;

E. Committing any act of violence or making any overt or implicit threat of violence against any person known or believed to be a current or former employee of RMSB&G, or any person known or believed to be a family member, ~~friend~~, client, vendor, affiliate or business associate of any RMSB&G current or former employee;

F. Attempting to block the Internet web site, e-mail, facsimile lines or telephone lines of RMSB&G, or any person known or believed to be a current or former employee of RMSB&G, or any person known or believed

to be a family member, friend, client, vendor, affiliate or business associate of any RMSB&G current or former employee;

G. *Amplifying sounds with electronic equipment ~~or otherwise causing or creating any loud noise~~ at or near the home of any person known or believed to be a current or former employee of RMSB&G, or any person known or believed to be a family member, friend, client, vendor, affiliate or business associate of any RMSB&G current or former employee;

* Defendants shall act in accordance with any and all municipal noise ordinances. Should there be no applicable ordinance, defendants shall be prohibited from

H. Defendants shall be required to notify the police department of the township, municipality or borough of any intended protest or demonstration at the home or business premises of any person known or believed to be a current or former employee of RMSB&G, and the home or business premises of any person known or believed to be a family member, friend, client, vendor, affiliate or business associate of any RMSB&G current or former employee at least twenty four (24) hours prior to any intended protest or demonstration pursuant to this injunction of the number of protesters and of the time and duration of the intended protest;

I. Defendants shall be permitted to protest in a group of no more than ~~fifteen~~ twenty (20) ~~(15)~~ persons outside the 100-foot zone around the home** ~~or~~ business premises of any person known or believed to be a current or former employee of RMSB&G, or any person known to be a family member, friend, client, vendor, affiliate or business associate of any RMSB&G current or former employee for no more than ninety (90) minutes no more that two times per week; and

** or no more than thirty (30) persons outside the 100-foot zone around the

**IT IS FURTHER ORDERED** that defendants shall post the following language on the websites owned, operated or controlled by them:

"NOTICE: THE SUPERIOR COURT OF THE STATE OF NEW JERSEY HAS ISSUED AN ORDER PROHIBITING CERTAIN ACTIVITIES RELATING TO PLAINTIFF ROTENBERG MERIL SOLOMON BERTIGER & GUTTILLA, P.C.,THEIR CURRENT OR FORMER EMPLOYEES AND THEIR FAMILIES OR ANY PERSONS KNOWN OR BELIEVED TO BE FAMILY MEMBERS, THEIR CLIENTS, THEIR VENDORS, THEIR AFFILIATES, AND THEIR BUSINESS ASSOCIATES."

Such notice shall be posted as a continuously visible underlined hyperlink which, when clicked, displays a legible, complete, and unmodified copy of all pages of the order, ~~excluding the name of plaintiffs attorney~~. Such notice shall be posted on the home page of any website owned or operated by this defendant, in a typeface and color that is consistent with the most prominent reference to plaintiff on each such page, and in a manner whereby the hyperlink is proximately located to the most prominent reference to plaintiff on the page such that the hyperlink would ordinarily be displayed to users viewing the page; and

**IT IS FURTHER ORDERED** that the defendants shall have a continuing, on-going responsibility to email a complete and unmodified copy of all pages of this Order, to individuals on their respective email lists and to any persons who join said lists; and

**IT IS FURTHER ORDERED** that any opposition to the plaintiff's application must be filed an served by August 22, 2006; and

**IT IS FURTHER ORDERED** that any reply to opposition must be filed and served by August 29, 2006; and ***

**IT IS FURTHER ORDERED** that true copies of the Verified Complaint, the Certifications, Brief and this Order be served upon defendants within 3 days from the date hereof.

Peter E. Doyne, P.J.S.C.

*** Opposition and Reply Papers must be filed with the Bergen County Chancery Clerk in Room 419, served upon the adversary; and a copy provided directly to Judge Doyne's chambers in Room 322.

# EXHIBIT
# 8

**COLE, SCHOTZ, MEISEL,**
**FORMAN & LEONARD, P.A.**
**A PROFESSIONAL CORPORATION**
Court Plaza North
25 Main Street
P. O. Box 800
Hackensack, New Jersey 07602-0800
(201) 489-3000
(201) 489-1536 Facsimile
Attorneys for Plaintiffs HUNTINGDON LIFE SCIENCES, INC.;
and LIFE SCIENCES RESEARCH, INC.

---

HUNTINGDON LIFE SCIENCES, INC. and LIFE SCIENCES RESEARCH, INC.,

Plaintiffs,

v.

NICHOLAS COONEY a/k/a NICK COONEY; HUGS FOR PUPPIES; JANE DOES 1-100, NAMES BEING FICTITIOUS; RICHARD ROES 1-100, NAMES BE FICTITIOUS,

Defendants.

---

SUPERIOR COURT OF NEW JERSEY
CHANCERY DIVISION:
BERGEN COUNTY

DOCKET NO.: C-435-06

CIVIL ACTION

**ORDER TO SHOW CAUSE WITH TEMPORARY RESTRAINTS**

THIS MATTER having been opened to the Court upon the application of Cole, Schotz, Meisel, Forman & Leonard, P.A., attorneys for plaintiff Huntingdon Life Sciences, Inc. ("HLS"), and its parent corporation, Life Sciences Research, Inc. ("LSR"); and defendants Nicholas Cooney, a/k/a Nick Cooney; Hugs For Puppies, Jane Does 1-100 and Richard Roes 1-100, Names Being Fictitious, having been notified of the within application; and the Court having considered the plaintiff's Verified Complaint, the Certification annexed thereto, and brief in support thereof;

It is on this 22nd day of December, 2006;

43776/0003-3103544v3

Exhibit "8"

ORDERED, that the defendants Nicholas Cooney, a/k/a Nick Cooney, and Hugs For Puppies, show cause before this Court, located at the Justice Center, 10 Main Street, Room 323, Hackensack, Bergen County, on the 19th day of Jan, 2007 at 10 A.M. or as soon thereafter as counsel may be heard, as to why the relief demanded in the plaintiff's Verified Complaint should not be granted as follows:

(A) Enjoining defendants, each of them, and their members, agents, employees, representatives, supporters, and all persons or entities acting in concert and participation with them or with actual notice of the order, during the pendency of this action, from committing or furthering the commission of any of the following acts:

(i) harassing, stalking, intimidating, menacing or committing or attempting to commit any act of violence, or making any overt or implicit threat of violence against any employee, consultant, independent contractor or director of HLS or LSR or any entity known or believed to have business or economic relations with HLS or LSR, or known or believed to have a prospective business or economic relationship with HLS or LSR, including but not limited to market makers, investors, customers and suppliers, or against any person known or believed to be a family member of any such person;

(ii) trespassing on the real property of, or interfering with, vandalizing or damaging the real or personal property of, any employee, consultant, independent contractor or director of HLS or LSR or any entity known or believed to have business or economic relations with HLS or LSR, or known or believed to have a prospective business or economic relationship with HLS or LSR, including but not limited to market makers, investors, customers and suppliers, or of any person known or believed to be a family member of any such person;

(iii) placing or maintaining upon any website, or disseminating electronically over the internet, by e-mail or otherwise, any personal or confidential information regarding any employee, consultant, independent contractor or director of HLS or LSR or any entity known or believed to have business or economic relations with HLS or LSR, or known or believed to have a prospective business or economic relationship with HLS or LSR, including but not limited to market makers, investors, customers and suppliers, or regarding any person known or believed to be a family member of any such person;



43776/0003-3103544v3

(iv) organizing, promoting, conducting, convening or engaging in any demonstration, protest, and/or picketing or leafleting activity within 100 feet of the business premises of HLS or LSR, or any entity known or believed to have business or economic relations with HLS or LSR, or known or believed to have a prospective business or economic relationship with HLS or LSR, including but not limited to market makers, investors, customers and suppliers, or within 100 feet of any business location of any person known or believed to be a family member of any such person, without complying with the reasonable time, place and manner restrictions and requirements set forth at subparagraph xi (a), (b) and (c) below;

(v) organizing, promoting, conducting, convening or engaging in any demonstration, protest, and/or picketing or leafleting activity within 100 feet of any real property owned by or known or believed to be in the possession of any employee, consultant, independent contractor or director of HLS or LSR or any entity known or believed to have business or economic relations with HLS or LSR, or known or believed to have a prospective business or economic relationship with HLS or LSR, including but not limited to market makers, investors, customers and suppliers, or within 100 feet of any real property owned by or known to be in the possession of any person known or believed to be a family member of any such person, without complying with the reasonable time, place and manner restrictions and requirements set forth at subparagraph xi (a), (b) and (c) below;

(vi) approaching any employee, consultant, independent contractor, or director of HLS or LSR or any entity known or believed to have business or economic relations with HLS or LSR, or known or believed to have a prospective business or economic relationship with HLS or LSR, including but not limited to market makers, investors, customers and suppliers, or any person known or believed to be a family member of any such person;

(vii) screaming, shouting, yelling, amplifying sounds with electronic equipment or otherwise causing or creating any loud disturbing or annoying noise at or near the home of any employee, consultant, independent contractor, or director of HLS or LSR or any entity known or believed to have business or economic relations with HLS or LSR, or known or believed to have a prospective business or economic relationship with HLS or LSR, including but not limited to market makers, investors, customers and suppliers, or any person known or believed to be a family member of any such person;

(viii) making any phone calls of a threatening or harassing nature, or directing, causing, inducing or encouraging others to make any phone calls of a threatening or harassing nature, to the offices of HLS or LSR, or to the offices of any entity known or believed to have business or economic

relations with HLS or LSR, or known or believed to have a prospective business or economic relationship with HLS or LSR, including but not limited to market makers, investors, customers and suppliers, or to the home or cellular telephones of any employee, consultant, independent contractor or director of any such business entity, or to any person known or believed to be a family member of any such person;

(ix) sending any unsolicited e-mail of a threatening or harassing nature, or directing, causing, inducing or encouraging others to send any such unsolicited e-mail, to any account owned by or maintained for the benefit of HLS or LSR or any entity known or believed to have business or economic relations with HLS or LSR, or known or believed to have a prospective business or economic relationship with HLS or LSR, including but not limited to market makers, investors, customers and suppliers, or to any account owned or maintained for the benefit of any employee, consultant, independent contractor or director of any such business entity, or to any person known or believed to be a family member of any such person;

(x) blocking or attempting to block the internet website, e-mail, facsimile lines or telephone lines of HLS or LSR or any entity known or believed to have business or economic relations with HLS or LSR, or known or believed to have a prospective business or economic relationship with HLS or LSR, including but not limited to market makers, investors, customers and suppliers, through so called "phone blockades," "black faxes," "web attacks," or other means; and

(xi) Imposing the following reasonable time, place and manner restrictions upon the defendants' "protests":

(a) Requiring defendants to notify the police department of the township, municipality or borough of any intended protest or demonstration at least seventy-two (72) hours prior to any intended protest or demonstration pursuant to this injunction:

(b) Requiring defendants to protest in a group of no more than fifteen (15) persons, for no more than ninety (90) minutes every two weeks, between 9:00 a.m. and 5:00 p.m., Monday through Friday, excluding state and federal holidays; and

(c) Prohibiting defendants from wearing masks, bandanas, hoods, or other items intended to cover faces and conceal identities; and

(xii) granting such other relief, including but not limited to attorneys' fees and costs, as the Court may deem just and appropriate; and

IT IS FURTHER ORDERED that a Temporary Restraining Order be issued, effective immediately as of the date of this Order to Show Cause, and to continue, remaining in full force and effect until such time as the Court has issued a ruling on plaintiffs' application for a Preliminary Injunction, restraining and enjoining defendants Nicholas Cooney, a/k/a Nick Cooney, and Hugs For Puppies, jointly and severally, and their members, employees representatives, and all persons or entities acting in concert and in participation with them and with actual notice of the order, from committing or furthering the commission of any of the following acts:

(i) harassing, stalking, intimidating, menacing or committing or attempting to commit any act of violence, or making any overt or implicit threat of violence against any employee or director of HLS or LSR or any entity set forth on Schedule A hereto, or any market makers, investors, customers and suppliers of HLS or LSR, or any person who is a family member of any such person;

(ii) trespassing on the real property of, or interfering with, vandalizing or damaging the real or personal property of, any employee or director of HLS or LSR or any entity set forth on Schedule A hereto, or any market makers, investors, customers and suppliers of HLS or LSR, or against any person who is a family member of any such person;

(iii) Placing or maintaining upon any web site any information regarding any person known or believed to be a current or former employee of HLS or LSR or any entity set forth on Schedule A, or any market markers, investors, customers and suppliers of HLS or LSR, or any person who is a family member or any such person ;

(iv) organizing, promoting, conducting, convening or engaging in any demonstration, protest, and/or picketing or leafleting activity within 100 feet of the business premises of HLS or LSR, or any entity set forth on Schedule A hereto, or any market makers, investors, customers and suppliers of HLS or LSR, or within 100 feet of any business location of any person who is a family member of any such person, without complying with the reasonable time, place and manner restrictions and requirements set forth at subparagraphs xi(a) and (b) below;

(v) organizing, promoting, conducting, convening or engaging in any demonstration, protest, and/or picketing or leafleting activity within 100 feet of any real property owned by or known or believed to be in the possession of any employee or director of HLS or LSR or any entity set forth on Schedule A hereto, or any market makers, investors, customers and suppliers of HLS or LSR, or within 100 feet of any real property owned by or known to be in the possession of any person who is a family member of any such person, without complying with the reasonable time, place and manner restrictions and requirements set forth at subparagraphs xi(a) and (b) below;

(vi) approaching any employee or director of HLS or LSR or any entity set forth on Schedule A hereto, or any market makers, investors, customers and suppliers of HLS or LSR, or any person who is a family member of any such person;

(vii) Defendants shall act in accordance with any and all municipal noise ordinances. Should there be no applicable ordinances, defendants shall be prohibited from amplifying sounds with electronic equipment at or near the home of any current or former employee or director of HLS or LSR or any entity set forth on Schedule A, or at or near the home of any current or former employee or director of any market makers, investors, customers and suppliers of HLS or LSR, or any person who is a family member of any such person;

(viii) making any phone calls of a threatening or harassing nature, or directing, causing, inducing or encouraging others to make any phone calls of a threatening or harassing nature, to the offices of HLS or LSR, or to the offices of any entity set forth on Schedule A hereto, or to the offices of any market makers, investors customers, and suppliers of HLS or LSR, or against any person who is a family member of any such person, or to the home or cellular telephones of any employee or director of any such business entity, or to any person who is a family member of any such person;

(ix) sending any unsolicited e-mail of a threatening or harassing nature, or directing, causing, inducing or encouraging others to send any such unsolicited e-mail, to any account owned by or maintained for the benefit of HLS or LSR or any entity set forth on Schedule A hereto, or to any account owned or maintained for the benefit of any employee or director of any such entity, or to any person who is a family member of any such person;

(x) blocking or attempting to block the internet website, e-mail, facsimile lines or telephone lines of HLS or LSR or any entity set forth on Schedule A, or to market makers, investors, customers and suppliers,

through so called "phone blockades," "black faxes," "web attacks," or other means; and

(xi) Imposing the following reasonable time, place and manner restrictions upon the defendants' "protests":

(a) Requiring defendants to notify the police department of the township, municipality or borough of any intended protest or demonstration at least seventy-two (72) hours prior to any intended protest or demonstration pursuant to this injunction;

(b) Requiring defendants to protest in a group of no more than fifteen (15) persons, for no more than ninety (90) minutes every two weeks; between 9:00 a.m. and 5:00 p.m., Monday through Friday, excluding state and federal holidays; and

IT IS FURTHER ORDERED that plaintiffs may supplement Schedule A, as appropriate, to include additional entities or individuals with whom they have existing or prospective business relationships by providing the Court and defendants with a revised Schedule A; and

IT IS FURTHER ORDERED that defendants, each of them, and their members, officers, employees, representatives, affiliates, and all persons in active concert with them shall post on all websites owned, operated or controlled by any of the defendants, which relate to animal rights or a campaign against HLS or LSR, the following language:

> "Notice: The Superior Court of the State of New Jersey has issued an order prohibiting certain activity relating to Huntingdon Life Sciences, Inc. and Life Sciences Research, Inc., and any persons or entities having business or economic relations with Huntingdon Life Sciences, Inc. or Life Sciences Research, Inc."

Such notice shall be posted as a continuously visible underlined hyperlink which, when clicked, displays only a legible, complete and unmodified copy of all pages of the order. Such notice shall be posted on the home page of any website owned or operated by defendants, including without limitation www.hugsforpuppies.org and www.myspace.com/hugsforpuppies, in a typeface and color that is consistent with the most prominent reference to plaintiffs on each such

page, and in a manner whereby the hyperlink is proximately located to the most prominent reference to plaintiffs on the page such that the hyperlink would ordinarily be displayed to users viewing the page; and

IT IS FURTHER ORDERED that the defendants shall have a continuing, on-going responsibility to email a complete and unmodified copy of all pages of this Order, to individuals on their respective email lists and to any persons who join said lists; and

IT IS FURTHER ORDERED that any opposition to the plaintiffs' application must be filed and served by 1/5 2007, and

IT IS FURTHER ORDERED that any reply to opposition may ~~must~~ be filed and served by 1/12/07 and

IT IS FURTHER ORDERED that this Order to Show Cause shall serve as a summons and a representative of Cole, Schotz, Meisel, Forman & Leonard, P.A. is hereby specifically appointed pursuant to R. 4:3-3 to serve two (2) copies of this Order to Show Cause with Temporary Restraints and Verified Complaint, upon Defendant in a manner consistent with R. 4:4-1 + 4:4-4, this being original process ~~including personally and/or by certified mail, return receipt requested, which shall be deemed good and sufficient service~~; and it is further

IT IS FURTHER ORDERED that Plaintiff's counsel is authorized to give notice to Defendants as to the entry of this Order to Show Cause with Temporary Restraints via e-mail; and it is further

IT IS FURTHER ORDERED that Defendant shall serve and file an Answer to the Verified Complaint within thirty-five (35) days of the date of the service of the Verified Complaint in accordance with this Order. If Defendant fails to answer or otherwise appear,



43776/0003-3103544v3

Judgment by default may be rendered against him for the relief demanded in the Verified Complaint.

HONORABLE PETER H. DOYNE, J.S.C.

# SCHEDULE A

NYSE GROUP, Inc. and its subsidiaries

SmithKline Beecham Corporation d/b/a GlaxoSmithKline

# EXHIBIT 9

**IN THE HIGH COURT OF JUSTICE**
**QUEEN'S BENCH DIVISION**
**Before the** Honourable Mr Justice Langley
BETWEEN:-

**Case no: HQ07X00316**

(1) **LIFFE ADMINISTRATION AND MANAGEMENT** (for and on behalf of all members of the Euronext Group of Companies (as defined in Schedules 3 and 4) and the New York Stock Exchange Group of Companies (as defined in Schedule 5) who retain employees pursuant to CPR 19.6)

(2) **JOHN WILSON** (for and on behalf of the employees of the Euronext Group of Companies (as defined in Schedules 3 and 4) and the New York Stock Exchange Group of Companies (as defined in Schedule 5) pursuant to CPR 19.6)

SUPREME COURT OF ENGLAND AND WALES – 6 FEB 2007 CENTRAL OFFICE ACTION DEPARTMENT

**Claimants**

- and -

(1) **STOP HUNTINGDON ANIMAL CRUELTY** ("SHAC") (by its representative Dr Max Gastone acting for and on behalf of the members of SHAC and all protestors conducting activities against the Claimants pursuant to CPR 19.6)
(2) **GREG AVERY**
(3) **NATASHA AVERY**
(4) **HEATHER JAMES**

**Defendants**

---

**ORDER**

---

**PENAL NOTICE**

**IF YOU THE WITHIN NAMED DEFENDANTS DISOBEY THIS ORDER YOU MAY BE HELD TO BE IN CONTEMPT OF COURT AND MAY BE IMPRISONED OR FINED OR YOU MAY BE FOUND TO BE GUILTY OF A CRIMINAL OFFENCE FOR WHICH YOU MAY BE IMPRISONED OR FINED OR BOTH**



Exhibit "9"

## IMPORTANT NOTICE

**If you do not obey this Order you will be guilty of contempt of Court and you may be fined or sent to prison or may be guilty of a criminal offence for which you may be fined or sent to prison or both.**

**An application notice was made on 29th January 2007 by the solicitor for the Claimants to the Court. The Court heard the application and read the Witness Statements listed in Schedule 1 and accepted the undertakings in Schedule 2 at the end of this Order**

## DEFINITIONS

**This Order shall be construed in accordance with the following Orders and/or Definitions:-**

1. That the Second Claimant, John Wilson (who is the Director of Group Security of the Euronext Group) do represent the interests of the First Claimants, the employees of the Euronext Group of Companies who are listed in Schedules 3 and 4, the employees of the New York Stock Exchange Group of Companies ("NYSE") who are listed in Schedule 5 and the Protected Persons (as defined below) pursuant to the Civil Procedure Rules 1998 (CPR) 19.6.

2. In this order harass has the same meaning as in the Protection from Harassment Act 1997 and references to "he", "him" or "his" shall be taken as meaning "she", "her" or "hers" where appropriate.

3. In this Order "Exclusion Zone" or "Zones" shall mean any areas in which Protesting activities are prohibited or curtailed by this order or otherwise.

4. In this order Protestor or Protestors shall mean:

4.1 the Defendants whether by themselves their servants or agents or otherwise;

4.2 any other person who is acting in concert with any of the Defendants to do any act prohibited by this Order and who has notice of the terms of this Order whether by himself his servants or agents or otherwise; and

4.3 any other person who has been given notice of the terms of this Order whether by himself his servants or agents or otherwise.

5. In this Order the Protected Persons shall mean:

5.1 the Second Claimant;

5.2 the employees of the First Claimant and of the Euronext Group of Companies listed in Schedule 3;

5.3 the employees of all companies which form part of the Euronext Group of Companies listed in Schedule 4;

5.4 the employees of all companies which form part of the NYSE Group of Companies listed in Schedule 5;

5.5 directors and non-executive directors of the First Claimant and all the companies listed in Schedules 3, 4 and 5;

5.6 the employees of contractors of the First Claimant, and of the companies listed in Schedules 3, 4 and 5 who are working at the Premises referred to in this

Order;

5.7 the families, servants or agents of the employees, directors, non-executive directors and their contractors, referred to in this paragraph;

5.8 any person seeking to visit the Premises, or any premises referred to in this Order, or any premises or residence (whether permanent or temporary) belonging to or occupied by any of the Protected Persons.

## THE ORDER

**IT IS ORDERED until trial or further Order that:-**

6. The Protestors be restrained from pursuing a course of conduct which amounts to harassment of the Protected Persons contrary to the Protection from Harassment Act 1997.

7. **AND** in particular the Protestors be restrained, under the terms of the Protection from Harassment Act 1997, from:

7.1 assaulting, molesting, harassing, threatening,or otherwise interfering with the Protected Persons (as defined above) by doing acts which cause harassment, intimidation or harm whether directly or indirectly to the Protected Persons by any means whatsoever;

7.2 photographing or videoing the Protected Persons or their vehicles (such activities are prohibited in their entirety) save that, for avoidance of doubt, Protestors may photograph each other and non Protected Persons including Police Officers;

7.3 making any threatening communication whether orally, by telephone, in writing, by facsimile, by electronic transfers (e-mail), or otherwise howsoever to any Protected Person, which shall include repetitive telephone calls, facsimiles or e-mails;

7.4 publishing by any means whatsoever names, addresses, telephone numbers, fax numbers, electronic-mail addresses, photographs, vehicle registration numbers or any other material serving to identify a Protected Person or to publish his personal details;

**PROVIDED THAT**

as and when a Protected Person is identified as such for the purposes of a newspaper article or a radio or television programme there shall be no restraint upon the terms of any media response by a Protestor nor upon any repetition of that which featured in the media.

7.5 compelling any Protected Person from:-

(i) doing something that he is entitled or required to do; or

(ii) doing something that he is not under any obligation to do;

7.6 knowingly picketing, protesting, demonstrating or loitering within 100 yards of the houses or flats (including but not limited to permanent residential accommodation, temporary residential accommodation or holiday accommodation) of any of the Protected Persons (being Exclusion Zones);

7.7 (subject to clause 7.8 below) coming to, remaining on, trespassing or conducting any demonstrations or protesting or other activities within the following areas of land identified on the plans annexed hereto and coloured in pink, blue and yellow, being Exclusion Zones and being land situated in the immediate vicinity of:-

(i) Cannon Bridge House, 1 Cousin Lane,
London EC4R 3XX
(being the First Claimant's Property)

(ii) Queensbury House, 3 Old Burlington Street,
London W1S 3AE
(being the Property of NYSE)

(iii) 25 Old Broad Street, London, EC2N 1HN
(being the property of Archipelago);

(Together the "Premises")

7.8 conducting any demonstrations or protesting or other animal rights related activities within the exclusion zones referred to in sub-paragraph 7.8 above save that demonstrations may be conducted once every 7 days in each of the aforesaid exclusion zones on the following terms namely:-

(i) that the number of Protestors present at such demonstrations shall not exceed 12 individuals

(ii) that the maximum duration for such demonstrations shall not exceed 6 hours between 10.00 AM and 4.00 PM;

(iii) demonstrations may only occur in the designated areas marked on the plans annexed hereto;

(iv) the Protestors may enter the Exclusion Zones for the sole purpose of gaining access to the designated areas **PROVIDED** that the Protestors fully comply with the terms of this sub-paragraph;

(v) the Protestors may not use any instruments or devices whatsoever which may or may not be designed for the making of artificial or musical noise or to amplify sound, save that the Protestors may use one loud hailer for oral communication, for not longer than 2 periods of 15 minutes one hour apart between 10am and 12pm and 2pm and 4pm only, directed away from the Protected Persons;

(vi) it is a condition precedent to the terms of this sub-paragraph that not less than 24 hours before the proposed demonstration, the Protestors shall have first notified the police at the following telephone numbers:-

**IT IS FURTHER ORDERED THAT:**

8. Nothing in this Order shall prevent the Protestors each month from seeking to enter one of the Exclusion Zones referred to in paragraph 7(7) in order to conduct one lawful peaceful procession or assembly on terms that there be strict compliance with Sections 11, 12 and 14 Public Order Act 1986 and at least 21 days shall pass between each protest allowed under this paragraph.

9. The Claimants have permission to enforce the Order herein against the members of the Defendants and the Protestors as defined in this Order, pursuant to CPR 19.6(4)(b) and to the Protection from Harassment Act 1997.

10. There be substituted service of this Order herein on the Defendants by sending the same by pre-paid ordinary first class post in sealed envelopes addressed to the Defendants at Stop Huntingdon Animal Cruelty ("SHAC") c/o Friend, 89 Bush Road, East Peckham, Tonbridge, Kent.

11. There be substituted service of this Order by exhibiting the same on posts around the Claimants' boundaries within the Exclusion Zones.

12. There be substituted service of this Order by posting a copy of the same on the First Defendant's Website: www.shac.net on terms that all the Defendants are Ordered, within 5 working days of receiving a copy of this Order in electronic form from the Claimants' solicitors, to place and maintain copies of this Order on the above website or any further websites created or controlled by them and to take all steps necessary to bring the same to the attention of their members or agents or subscribers and to the attention of the Protestors referred to in this Order. In particular the Second, Third and Fourth Defendants are ordered to use their best endeavours to ensure that copies of this Order are placed on the websites referred to above.

13. Liberty to the Claimants to apply on notice to extend the Exclusion Zones referred to in this Order.

14. Liberty for the parties to alter by agreement the location of the designated areas referred to in the Exclusion Zones referred to in this order by lodging with the Court amended plans signed by the Claimant's solicitors and either of the First, Second, Third or Fourth Defendants, or to add Exclusion Zones necessary to protect the Protected Persons and any future Protected Persons, and generally.

15. The Defendants and any party affected by this Order may apply to the Court at any time to vary or discharge this Order but if they wish to do so, they must first inform the Claimants' solicitors in writing at least 7 days beforehand.

16. Without prejudice to the terms of paragraphs 13, 14 and 15 above, this action shall be stayed pending the outcome of the trial in the action numbered HQ03X01149 entitled Huntingdon Life Sciences Group PLC and Others -v- Stop Huntingdon Animal Cruelty and Others.

17. Costs be reserved.

**GUIDANCE NOTES**

**THE EFFECTS OF THIS ORDER**

I A Defendant or a Protestor who is an individual who is Ordered not to do something must not do it himself or in any other way. He must not do it through others acting on his behalf or on his instructions or with his encouragement.

II A Defendant or a Protestor which is a corporation and which is Ordered not to do something must not do it itself or by its directors, officers, employees or agents or in any other way.

**Variation or Discharge of this ORDER**

The Defendant (or anyone notified of this Order) may apply to the Court at any time to vary or discharge this Order (or so much of it as affects that person), but anyone wishing to do so must first inform the Claimants' legal representatives, in writing at least 24 hours beforehand.

**INTERPRETATION OF THIS ORDER**

III In this Order, where there is more than one Defendant, (unless otherwise stated) references to "the Defendant" means both or all of them.

IV A requirement to serve on "the Defendant" means on each of them. However, the Order is effective against any Defendant on whom it is served.

V An Order requiring "the Defendant" to do or not to do anything applies to all Defendants.

**COMMUNICATIONS WITH THE COURT**

All communications to this Court about this Order should be sent to Room WG08, Royal Courts of Justice, Strand, London WC2A 2LL quoting the case number. The Telephone number is 020 79476010. The offices are open between 10am and 4.30 pm Monday to Friday.

**SCHEDULE 1**

**Evidence**: The Court read the following Witness Statement before making this Order:

1. The First Witness statement of John Wilson
2. The Witness Statement of Superintendent Stephen Pearl
3. The First Witness Statement of Catherine Atkinson
4. The First Witness Statement of Greg Avery
5. The First Witness Statement of Natasha Avery
6. The First Witness Statement of Daniel Amos
7. The First Witness Statement of Gerrah Selby

**SCHEDULE 2**

Undertakings given to the Court by the Claimants:-

If the Court later finds that this Order has caused loss to the Defendants, and decides that the Defendants should be compensated for that loss, the Claimants will comply with any order the Court may make;

**SCHEDULE 3**

**The Euronext Group of Companies in England and Wales:**

Euronext UK Plc

Euronext London Limited

LIFFE (Holdings) plc

LIFFE Services Limited

LIFFE Trustees Limited

Atos Euronext Market Solutions Limited

**SCHEDULE 4**

**The Euronext Group of Companies in Europe:**

Euronext N.V.

Euronext Amsterdam N.V.

Euronext Brussels S.A./N.V.

Euronext Lisbon - Sociedade Gestora de Mercados Regulamentados, S.A.

Euronext Paris S.A.

**SCHEDULE 5**

**The New Stock Exchange Group ("NYSE") Group of Companies in England and Wales:**

NYSE Group Inc ("NYSE")

Archipelago Europe Ltd ("Archiapelago")

Dated this 2nd day of February 2007.

**IN THE HIGH COURT OF JUSTICE** **Case no: HQ07X00316**
**QUEEN'S BENCH DIVISION**
**Before the** Honourable Mr Justice Langley
BETWEEN:-

**(1)** **LIFFE ADMINISTRATION AND MANAGEMENT** (for and on behalf of all members of the Euronext Group of Companies (as defined in Schedules 3 and 4) and the New York Stock Exchange Group of Companies (as defined in Schedule 5) who retain employees pursuant to CPR 19.6)

**(2)** **JOHN WILSON** (for and on behalf of the employees of the Euronext Group of Companies (as defined in Schedules 3 and 4) and the New York Stock Exchange Group of Companies (as defined in Schedule 5) pursuant to CPR 19.6)

**Claimants**

- and -

**(1)** **TOP HUNTINGDON ANIMAL CRUELTY** ("SHAC") (by its representative Dr Max Gastone acting for and on behalf of the members of SHAC and all protestors conducting activities against the Claimants pursuant to CPR 19.6)

**(3)** **GREG AVERY**
**(4)** **NATASHA AVERY**
**(5)** **HEATHER JAMES**

**Defendants**

---

**ORDER**

---

By the Royal Courts of Justice


CANNON STREET
CLOAK LANE
COLLEGE HILL
OXFORD COURT
BUSH LANE
GOPHIR LANE
SUFFOLK LANE
Cannon Street Station (Terminus)
Vestry House
UPPER THAMES STREET
ANGEL PASSAGE
BELL WHARF LANE
Waterman's Walk
Three Cranes Walk
DESIGNATED PROTEST AREA
Exclusion Zones
Cannon Bridge
London
EC4R 3XX
Company Premises
Public / Private Areas
Highways / Footpaths



DESIGNATED PROTEST AREA
Exclusion Zones
3 Old Burlington St
W1S 3AE
Company Premises
Public / Private Areas
Highways / Footpaths
West End Central Police Station
BOYLE STREET
NEW BURLINGTON MEWS
Heddon Street
HEDDON STREET
CORK STREET
CORK ST MEWS
NEW BOND STREET
ALBEMARLE STREET
Royal Arcade
Bank
PO


NEW BROAD STREET
Posts
LB
Capel House
Tennis Court
Broad Street House
WORMWOOD STREET
FB
TCBs
AUSTIN FRIARS SQUARE
BISHOPSGATE
GREAT ST HELEN'S
CROSBY SQUARE
Crosby Court
Adams Court
TCP
Fn
Turntable
DESIGNATED
PROTEST AREA
Exclusion Zones
Tower 42
25 Old broad St
EC2N 1HN
Company Premises
Public / Private Areas
Highways / Footpaths

# EXHIBIT

# 10

# I Control Wall Street



**On Dec. 22nd, Wall Street snuck the puppy killers at Huntingdon Life Sciences (HLS) onto the newly formed NYSE Arca exchange.**

**However, there was one thing NYSE Arca forgot when supporting Huntingdon Life Sciences: who controls Wall Street.**

**On April 20th, remind Wall Street who really calls the shots. Tell NYSE Arca to drop Huntingdon Life Sciences.**

**Friday, April 20th**
**Meet Up: 11:30 am**
**Starbucks at**
**55 Broad Street**

Find out more at

## NYSE Arca Demo

Exhibit "10"



# ADL Weekend of Action April 19th-22nd

Come down to the NY tri-state area for the weekend of the 19th- 22nd and help destroy Huntingdon Life Sciences (HLS) with actions aimed at the New York Stock Exchange. The entire weekend will be focused on NYSE Arca the electronic trading system that allows HLS to be traded anonymously. There is one simple demand for NYSE Arca. DROP HLS!

Below is a preliminary schedule of events; many more details will be following in the coming weeks. Inform others and bring friends. Watch out for more information at www.animaldefense.info or www.myspace.com/animaldefenseleague

**Thursday, April 19th: New York City**

7:00 pm *Activist meet up dinner*
Strice - 45 8th Ave, New York at W 4th St
By Subway: Take the A,C,E,L to 14th Street & 8 Ave. Station

**Friday, April 20th: New York City**

11:30 am: *NYSE Arca Demo*
Meet up at Starbucks on 55 Broad Street
By Subway: Take the 1,2,3,4,5 A,C,J,M,N, R,W and get off near Broad Street

6:00 pm *NYC Friday Night Demo*
Meet up on steps of the Met Museum
1000 Fifth Avenue at 82nd Street
By Subway: Take 4,6 to 77th and walk Northwest toward 5th Ave

**Saturday, April 21st: Long Island**

Noon *Long Island Day of Demos*
Meet up at Starbucks on 1441 Jericho Turnpike (25), near the intersection of Jericho Turnpike and Clinch Ave at 12 noon sharp.
By Train: Take LIRR to New Hyde Park and walk north 0.2 miles to Jericho Turnpike

**Sunday, April 22nd: Earth Day Social and Demos**

1:00 pm *Vegan BBQ Social*
Stay Tuned for more information at www.animaldefense.info

*** Housing will be provided in New York City Brooklyn on Thursday and Friday nights. Housing will be provided in Long Island on Saturday night

# EXHIBIT
# 11




HOME BITE BACK MAGAZINE DIARY OF ACTIONS F.A.Q. LIBRARY PRISONERS RESOURCES






NEWS FROM THE FRONTLINES

*reported anonymously:*

Redacted is a SCUMBAG employed by Euronext. The ALF paintstripped his cars and redecorated his fancy house.

Zero tolerance towards those who profit from the animals dying on the cage floors of Huntingdon Life Sciences.
Stop trading the shares of Huntingdon Life Sciences."



Exhibit "11"




NEWS FROM THE FRONTLINES

*anonymous communique:*

"The A.L.F. spraypainted your houses and vandalized your cars in the Netherlands. Some of you are known in the neighbourhood as PEDOPHILES, as we spraypainted this message on your houses. PAYBACK TIME FOR THE ANIMALS SUFFERING IN HUNTINGDON LIFE SCIENCES.

Redacted

Director Legal and Regulations Euronext
CALL ME DAY AND NIGHT
SPAMM ME

Redacted

Director Euronext

CALL ME DAY AND NIGHT
Euronext

Redacted

Supervisory Board Van der Moolen

Redacted

Supervisory Board Van der Moolen

CALL ME DAY AND NIGHT :
Dangerous Goods Management"